2004 UT App 95

**STATE of Utah, Plaintiff and Appellee,**

v.

**Victor VIALPANDO, Defendant and Appellant.**

**No. 20020405–CA.**

Court of Appeals of Utah.

April 1, 2004.

---

Shannon N. Romero, Salt Lake City, for Appellant.

Alicia H. Cook, Salt Lake City, for Appellee.

Before Judges GREENWOOD, ORME, and THORNE.

## OPINION

THORNE, Judge:

¶ 1 Victor Vialpando appeals his conviction for driving under the influence of alcohol, a class B misdemeanor, in violation of Utah Code Annotated section 41-6-44 (1998). We affirm.

## BACKGROUND

¶ 2 In the early morning hours of July 2, 2000, Trooper Jeffery Plank of the Utah Highway Patrol was patrolling the west side of Salt Lake County. As he drove northbound on 3200 West, the trooper noticed two people involved in a confrontation. A man, whom the trooper eventually identified as Vialpando, was chasing a woman across 3200 West and down the street. The trooper heard shouting from one or both of them. It was obvious to the trooper that the woman was not being playful, but was in fact fleeing from Vialpando. Suspecting possible violence, the trooper activated his overhead lights, sounded his siren, and looked for the closest opportunity to turn around. Soon thereafter, Vialpando abandoned the chase and crossed the street. The woman then left the scene. After crossing the street, Vialpando walked into a nearby parking lot where he got into a parked car. After observing what had occurred, the trooper pulled directly behind Vialpando's car. The trooper then approached Vialpando to ask about the confrontation.

¶ 3 As he approached Vialpando's car, the trooper noted that Vialpando was seated in the driver seat, the keys were in the ignition, the headlights were on, and Vialpando's seatbelt was secured. He then proceeded to question Vialpando. However, before Vialpando answered any of the trooper's questions, the trooper noticed that Vialpando's eyes were bloodshot and that he smelled strongly of alcohol. As Vialpando attempted to answer the trooper's questions, the trooper noticed that Vialpando's speech was slurred.

¶ 4 Consequently, the trooper asked Vialpando to get out of the vehicle and to submit to a few, routine field sobriety tests. Vialpando complied. In the trooper's opinion, Vialpando failed each test. The trooper therefore arrested Vialpando for driving under the influence of alcohol, handcuffed him, and read him his *Miranda* rights. He also asked whether Vialpando would submit to an intoxilyzer test.[1] Vialpando consented. The trooper placed him in the patrol car's front seat and proceeded to drive to the Sorenson Center—one of the central testing points within Salt Lake County. During the drive, sometime before 1:45 a.m., Vialpando told the trooper that he needed to vomit. The trooper stopped the car, opened the passenger side door, and allowed Vialpando to vomit outside. At 1:45 a.m., after Vialpando had finished vomiting, and after the trooper had

---

1. Vialpando was also charged with possession of an open container in a vehicle, in violation of Utah Code Annotated section 41–6–44.20 (1998); however, for reasons unclear from the record, he was not tried on this charge.

ensured that his mouth and throat were clear of foreign matter, the trooper continued toward the Sorenson Center.

¶ 5 The trooper arrived at the Sorenson Center a few minutes before two o'clock in the morning, sat Vialpando down, and prepared the intoxylyzer machine for Vialpando's test. After running the tests required to ensure that the machine was operating properly, the trooper tested Vialpando. According to the machine printout, Vialpando breathed into the machine at 2:00 a.m. and his blood alcohol volume was .175—well above the legal limit in Utah.

¶ 6 Vialpando was subsequently tried and convicted of driving under the influence of alcohol, and sentenced to 180 days in jail, which was suspended, twelve months of probation, and a $1,300.00 fine. He now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 7 Vialpando presents three arguments on appeal. He first argues that the trial court erred in denying his motion to suppress the evidence of his intoxication because the trooper lacked the requisite reasonable articulable suspicion necessary to initially detain him. "In reviewing a trial court's ruling on a motion to suppress evidence, we will not overturn its factual findings absent clear error. The trial court's legal conclusions, however, we review for correctness." *State v. Valenzuela*, 2001 UT App 332, ¶ 8, 37 P.3d 260 (quotations, citations, and alteration omitted).

¶ 8 Vialpando next argues that the trial court erred in admitting the results of his intoxilyzer test. We review a trial court's

decision to admit or preclude evidence to determine whether the court acted within its permitted range of discretion. *See Salt Lake City v. Garcia*, 912 P.2d 997, 999 (Utah Ct. App.1996).

¶ 9 Finally, Vialpando argues that the jury instructions concerning "actual physical control" were incorrect as a matter of law. Consequently, the jury was improperly instructed and Vialpando erroneously convicted. We review a trial court's jury instructions on the elements of the crime for correctness. *See American Fork v. Carr*, 970 P.2d 717, 719 (Utah Ct.App.1998).

## ANALYSIS

¶ 10 Vialpando first argues that the trooper lacked reasonable articulable suspicion sufficient to justify the initial detention.

> In determining whether the [trooper] had a reasonable articulable suspicion to justify [Vialpando's initial] detention, we "look to the totality of the circumstances ... to determine if there was an objective basis for suspecting criminal activity." In considering the totality of the circumstances, we " 'judge the officer's conduct in light of common sense and ordinary human experience ... and we accord deference to an officer's ability to distinguish between innocent and suspicious actions.' "

*State v. Beach*, 2002 UT App 160, ¶ 8, 47 P.3d 932 (ellipses in original) (citations omitted).[2]

¶ 11 Here, the trooper testified that on July 2, 2000, he was patrolling his regular area on the west side of Salt Lake County. After midnight, as he drove along 3200 West, near the South Frontage road, he witnessed Vialpando chasing a woman across 3200

---

2. It is understood, of course, that any detention, regardless of the justification, must be limited in scope and duration to the circumstances that prompted the detention. *See State v. Godina–Luna*, 826 P.2d 652, 654 (Utah Ct.App.1992) (stating "the length and scope of the detention must be strictly tied to and justified by the circumstances which rendered its initiation permissible" (quotations, citations, and alterations omitted)). Moreover, it is axiomatic that once the officer's suspicion has been alleviated the officer must allow the detainee to go on his way without further interference by the officer. *See State v. Humphrey*, 937 P.2d 137, 143 (Utah Ct.App.1997) (acknowledging that detentions resulting from a reasonable suspicion of criminal activity are focused on confirming or dispelling the suspicion that prompted the detention); *Godina–Luna*, 826 P.2d at 654–55 (stating "[o]nce the reasons for the [temporary detention] have been satisfied, the individual must be allowed to proceed on his or her way"); *see also Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). Although these rules do not control the outcome in the instant case, we highlight them to ensure that this case creates no misunderstanding concerning their viability.

West. The trooper further testified that he heard yelling and described the situation in terms of an altercation, a confrontation, and a fight. Under these circumstances, the trooper concluded that the woman might be in danger.

¶ 12 From these facts, we have no difficulty concluding that the trooper's initial detention of Vialpando was reasonable. The incident took place after midnight. It was dark, and nothing surrounding the chase would lead a person to conclude it was playful. Instead, the trooper saw Vialpando chasing a woman across the street while the woman attempted to flee. The trooper also heard one or both of the people yelling during the chase. Among the legitimate suspicions that arise under these facts is domestic violence.[3] Thus, the trooper's witnessing of the late night chase, involving a woman who clearly did not welcome the pursuit, coupled with the clear indication that the chase was not playful, fully supports the trooper's suspicion that something criminal had occurred or was about to occur. Accordingly, the trooper's decision to temporarily detain Vialpando while investigating the situation was reasonable.

 ¶ 13 Vialpando next argues that the trial court erred in admitting the results of his intoxilyzer exam. In essence, Vialpando argues that the State failed to make the required foundational showing; consequently, the trial court erred in concluding that a proper foundation had been laid for the test's admission into evidence. "A trial court's determination that there was a proper foundation for the admission of evidence 'will not be overturned unless there is a showing of an abuse of discretion.' " *State v. Torres*, 2003 UT App 114, ¶ 7, 69 P.3d 314 (citation omitted).

██ ¶ 14 To ensure that the results of an intoxilyzer test are reliable, the State must present evidence, inter alia, that: (1) the intoxilyzer machine had been properly checked by a trained technician, and that the machine was in proper working condition at the time of the test; (2) the test was administered correctly by a qualified operator; and (3) a police officer observed the defendant during the fifteen minutes immediately preceding the test to ensure that the defendant introduced nothing into his or her mouth during that time. *See In re Oaks*, 571 P.2d 1364, 1367 (Utah 1977) (Maughan, J., dissenting) (citing *State v. Baker*, 56 Wash.2d 846, 355 P.2d 806, 809–10 (1960) (articulating foundation elements for intoxilyzer tests)); *see also Salt Lake City v. Womack*, 747 P.2d 1039, 1041 (Utah 1987) (affirming the necessity of the pre-test observation period). Vialpando argues that the arresting trooper, who also administered the intoxilyzer test, failed to satisfy the observation requirement. Vialpando's argument centers on his claim that the observation period itself was insufficient, or in the alternative, that the nature of the trooper's observation was unsatisfactory.

¶ 15 At the suppression hearing, the trooper testified that he arrested Vialpando after Vialpando failed a series of field sobriety tests. The trooper handcuffed Vialpando's hands behind his back, read him his *Miranda* rights, and placed him in the patrol car's front passenger seat. The trooper then asked Vialpando if he was "willing to take the [intoxilyzer] test." Vialpando consented to the test, and, at about 1:37 a.m., the pair drove away from the scene of the arrest. Soon thereafter, Vialpando told the trooper that he had to vomit. The trooper quickly pulled over and allowed Vialpando to vomit outside of the car.

¶ 16 When Vialpando was finished, the trooper used his flashlight to check in Vialpando's mouth to ensure that it was clear of foreign matter. Satisfied that Vialpando's mouth was empty, the trooper began the required observation period at 1:45 a.m. The trooper arrived with Vialpando at the Sorenson Center before 2:00 a.m., and ran all of the pre-tests required to correctly administer an intoxilyzer test. Then, according to the readout, which was also admitted into evidence, the trooper tested Vialpando at 2:00

---

**3.** It is of no little consequence that domestic violence has come to be recognized as a heightened concern for both police officers and society in general. *See State v. Comer*, 2002 UT App 219, ¶¶ 21–26, 51 P.3d 55 (noting that reports of domestic violence can create the foundation for a probable cause determination), *cert. denied*, 59 P.3d 603 (Utah 2002).

a.m., exactly fifteen minutes after the trooper began the observation period.

¶ 17 The trial court found that the trooper observed Vialpando for the required fifteen-minute period and admitted the test results. In so ruling, the trial court acted within its permitted range of discretion. Although it is possible to conclude that the trooper was not credible in his assessment of the time that passed during his observation period, such assessments clearly lie in the hands of the trial court, and absent clear error this court is in no position to speculate on the credibility of witnesses. *See State v. Hansen,* 2002 UT 125, ¶ 48, 63 P.3d 650.

¶ 18 Nor are we willing to adopt the position urged by Vialpando concerning the quality of the trooper's observation. The purpose of the observation period is to ensure that a defendant does not introduce anything into his mouth that might taint the test results. While this requirement serves to ensure that the defendant places no food, drink, or smoke into his mouth during the observation period, its most important function is to ensure that any alcohol in a suspect's mouth is absorbed into the system before the test is administered. *See State v. Gardner,* 126 N.M. 125, 967 P.2d 465, 469 (Ct.App.1998). We do not believe that this requires the undivided attention of the observing officer. Instead, "the level of surveillance must be such as could reasonably be expected to" ensure that no alcohol has been introduced into the suspect's mouth, "from the outside or by belching or regurgitation," during the entire observation period. *State v. Carson,* 133 Idaho 451, 988 P.2d 225, 227 (Ct.App.1999). The purpose of the observation period is satisfied if (1) the suspect was in the officer's presence for the entire period; (2) it is clear that the suspect had no opportunity to ingest or regurgitate anything during the minimum observation period; and (3) nothing impeded the officer's powers of observations during the observation period. *See id.*

¶ 19 Here, the trooper placed Vialpando next to him in the front passenger seat of the patrol car, with Vialpando's hands handcuffed behind his back, preventing Vialpando from placing anything in his mouth. Vialpando sat next to the trooper for the entire fifteen-minute period, and during that time the trooper monitored, both visually and aurally, to ensure that Vialpando's mouth remained clear. The late hour and the minimal traffic presented little or no distraction to the trooper during the observation period, allowing the trooper to focus on driving and observing Vialpando. Moreover, unlike the situation presented in *Carson,* which Vialpando proffers as a nearly identical case, here there is no evidence that the weather was foul, or that the trooper's hearing was impaired. *See Carson,* 988 P.2d at 227. Furthermore, although Vialpando vomited both before and after the observation period, in both cases he informed the trooper of his situation before vomiting. Taken together, the trooper's monitoring of Vialpando, coupled with Vialpando's previous, as well as subsequent, act of alerting the trooper to his need to vomit, supports a reasonable belief that Vialpando's mouth was clear for the entire observation period. Therefore, the trial court could properly conclude that the purpose of the observation period was satisfied and that the intoxilyzer test results were reliable.

¶ 20 Finally, Vialpando argues that the trial court improperly instructed the jury concerning the elements required to find that he was in "actual physical control" of a vehicle. We disagree.

¶ 21 Section 41–6–44(2) states

A person may not operate *or be in actual physical control* of a vehicle within this state if the person: (i) has a blood or breath alcohol concentration of .08 grams or greater as shown by a chemical test given within two hours after the alleged operation or physical control.

Utah Code Ann. § 41–6–44(2)(a)–(2)(a)(i) (1998) (emphasis added). Vialpando argues that the controlling case interpreting the phrase "actual physical control" is *State v. Bugger,* 25 Utah 2d 404, 483 P.2d 442 (1971). To the extent that the *Bugger* court defined the phrase, Vialpando is correct. *See id.* at 443 (" '[A]ctual physical control' in its ordinary sense means 'existing' or 'present bodily restraint, directing influence, domination or regulation.' " (citations omitted)).

¶ 22 However, as we stated in *State v. Barnhart*, 850 P.2d 473 (Utah Ct.App.1993), "the *Bugger* decision is not particularly helpful to our analysis and does not serve as a guide to the trial courts and law enforcement and prosecutorial officials of this state." *Id.* at 478 n. 2. Consequently, because *Bugger* offers little guidance concerning the scope of "actual physical control," we concluded that the determination must be made through examining the "totality of the circumstances." *Id.* at 478. Thus, we referenced a nonexclusive list of factors that could bear on the determination, and noted that "the statute is intended to prevent intoxicated persons from causing harm by apprehending them before they operate a vehicle." *Id.* at 477–78.[4] Finally, we made clear that "a person need not actually move[ ] a vehicle, but only needs to have an apparent ability to start and move the vehicle in order to be in actual physical control." *Id.* at 477 (citation omitted).

¶ 23 Notably, the approach we adopted in *Barnhart* comports with the approach taken by the majority of jurisdictions in which similar statutory language can be found. *See, e.g., Farley v. City of Montgomery*, 677 So.2d 1251, 1252–53 (Ala.Crim.App.1995) ("Whether one is in 'actual physical control' of a vehicle is determined by a totality-of-the-circumstances test." (quotations and citations omitted)); *Kingsley v. State*, 11 P.3d 1001, 1003 (Alaska Ct.App.2000) (stating "a person may exercise actual physical control over a vehicle without making active attempts to operate it"); *State v. Love*, 182 Ariz. 324, 897 P.2d 626, 628 (1995) ("We find it preferable, as in other cases, to allow the trier of fact to consider the totality of the circumstances in determining whether defendant was in actual physical control of his vehicle."); *accord Savage v. State*, 252 Ga.App. 251, 556 S.E.2d 176, 180 (2001), *cert. denied* 2001 WL 1346297,

2002 Ga. LEXIS 275 (Ga. March 25, 2002); *People v. Eyen*, 291 Ill.App.3d 38, 225 Ill.Dec. 249, 683 N.E.2d 193, 199 (1997); *State v. Johnson*, 130 N.M. 6, 15 P.3d 1233, 1239–40 (2000); *State v. Lewis*, 131 Ohio App.3d 229, 722 N.E.2d 147, 150 (1999); *cf. State v. Wiggs* 60 Conn.App. 551, 760 A.2d 148, 150 (2000) (examining the meaning of operating a motor vehicle with results similar to our analysis of "actual physical control").

¶ 24 Vialpando cites to, and seemingly understands, the implications of *Barnhart*. However, he argues that *Barnhart* was decided in error because it gave insufficient deference to, and in fact insufficiently analyzed, *Bugger*, and instead relied upon civil driver license revocation cases in crafting the applicable standard. Specifically, Vialpando argues that this court failed to require the State to prove an intent "to operate or exercise control over a motor vehicle," and that we cannot look to civil cases for guidance in crafting our analysis for criminal cases. Vialpando is incorrect.

¶ 25 First, contrary to Vialpando's argument, *Bugger* did not establish a requirement that the State prove "a vehicle's occupants actively and affirmatively chose to exercise dominion and control over a motor vehicle." Instead, the State is required to prove that a defendant had an " 'existing' or 'present bodily restraint, directing influence, domination or regulation' " over the vehicle. *Bugger*, 483 P.2d at 442 (citation omitted). The defendant's conviction in *Bugger* was reversed not because the state failed to show intent, but because "the facts [did] not bring the case within the wording of the statute." *Id.* The defendant was arrested after being discovered asleep in his car with the car "completely off traveled portions of the highway." *Id.* at 442. Thus, the court determined that the defendant was not in physical control of

---

4. The factors articulated in *Barnhart* include
(1) whether [the] defendant was asleep or awake when discovered;
(2) the position of the automobile;
(3) whether the automobile's motor was running;
(4) whether [the] defendant was positioned in the driver's seat of the vehicle;
(5) whether [the] defendant was the vehicle's sole occupant;

(6) whether [the] defendant had possession of the ignition key;
· (7) [the] defendant's apparent ability to start and move the vehicle;
(8) how the car got to where it was found; and
(9) whether [the] defendant drove it there.
*State v. Barnhart*, 850 P.2d 473, 477 (Utah Ct. App.1993) (quotations and citations omitted).

the vehicle and did not address the issue of intent. Consequently, we conclude that rather than reading an element of intent into the statute, the *Bugger* court merely determined that "actual physical control" is necessary to violate the statute.

¶ 26 Moreover, we addressed whether the statute required a showing of intent in *Barnhart* and determined that "[it is] permissible for a trial court to find that a person had actual physical control over a vehicle even though the person did not subjectively intend to exercise it." 850 P.2d at 479. Underlying this conclusion was our determination that "the statute is intended to prevent intoxicated persons from causing harm by apprehending them before they operate a vehicle." *Id.* at 478. We further concluded that "a person need not actually move, or attempt to move, a vehicle, but only needs to have an apparent ability to start and move the vehicle in order to be in actual physical control." *Id.* (citation omitted); *see also State v. Johnson*, 130 N.M. 6, 15 P.3d 1233, 1239 (2000) ("The policy underlying the DWI statute is to prevent individuals from driving or exercising actual physical control over a vehicle when they, either mentally or physically, or both, are unable to exercise the clear judgment and steady hand necessary to handle a vehicle with safety both to themselves and the public." (quotations and citation omitted)); *State v. Blanton*, 121 Ohio App.3d 162, 699 N.E.2d 136, 141 (1997) ("The clear purpose of [the DWI statute] is to discourage persons from putting themselves in the position in which they can potentially cause the movement of a motor vehicle while intoxicated or under the influence of any drug of abuse." (quotations and citation omitted)). Accordingly, we conclude that *Bugger* does not require the State to prove intent to demonstrate that the statute has been violated. Rather, because both *Bugger* and section 41–6–44 are silent concerning culpable mental state, a violation of the statute occurs when a person "intention-

ally, knowingly, [or] recklessly" takes "actual physical control" of a vehicle, while intoxicated. Utah Code Ann. §§ 76–2–101(1), –102 (1999).[5]

¶ 27 The second flaw in Vialpando's *Barnhart* argument concerns our use of civil case law to guide our analysis. Although Vialpando argues that this court cannot rely on civil case law for guidance in criminal cases, he cites neither case law, nor statutory authority to support this proposition. Consequently, we decline to further address this claim. *See State v. Thomas*, 961 P.2d 299, 305 (Utah 1998). Accordingly, Vialpando's final argument is without merit and the trial court properly instructed the jury.

## CONCLUSION

¶ 28 Trooper Plank acted reasonably in detaining Vialpando after witnessing the late night chase on 3200 West. The trooper articulated sufficient facts to support the detention and we conclude that any reasonable police officer in the same situation would have also detained Vialpando to investigate the situation. Moreover, the trial court did not err in finding that the State had laid the proper foundation to support the admission of the intoxilyzer test results. Finally, the trial court did not err in instructing the jury concerning the factors necessary to show that Vialpando was in "actual physical control" of a vehicle at the time of his detention. Accordingly, we affirm Vialpando's conviction.

¶ 29 WE CONCUR: PAMELA T. GREENWOOD and GREGORY K. ORME, Judges.

---

5. Utah Code Annotated section 76–2–102 establishes that: "Every offense not involving strict liability shall require a culpable mental state, and when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility." Utah Code Annotated section

41–6–44(2) prohibits a person with a blood alcohol concentration of .08 grams or more from operating or being "in actual physical control of a vehicle." Utah Code Ann. § 41–6–44(2) (1998). It does not, however, specify any culpable mental state; thus, the State is not required to prove that Vialpando intended to be in "actual physical control" of the vehicle.