2007 UT 47

**STATE of Utah, Plaintiff and Respondent,**

v.

**Mitchell WORWOOD, Defendant and Petitioner.**

**No. 20060048.**

Supreme Court of Utah.

June 22, 2007.

---

Mark L. Shurtleff, Att'y Gen., J. Frederic Voros, Jr., Asst. Att'y Gen., Salt Lake City, Jared W. Eldridge, Nephi, for plaintiff.

Scott P. Card, Jennifer K. Gowans, Provo, for defendant.

PARRISH, Justice:

## INTRODUCTION

¶ 1 In this case, we consider the constitutional scope of an investigative detention conducted under reasonable suspicion. The detention at issue occurred when an off-duty highway patrolman, Korey Wright, stopped Marshall Worwood on suspicion that he was driving under the influence of alcohol. Wright did not conduct field sobriety tests at the site of the initial encounter. Instead, Wright detained Worwood in Wright's truck and transported him down a canyon to Wright's home, where an on-duty officer con-

ducted field sobriety tests. The district court denied Worwood's motion to suppress, and the court of appeals affirmed. We reverse the court of appeals, finding that Wright exceeded the scope of what was reasonably necessary to further his investigation.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 On June 20, 2003, Korey Wright, an off-duty Highway Patrol trooper, was driving with passenger Skylar Fautin down Deep Canyon in Juab County after a day of horseback riding. Wright saw defendant Mitchell Worwood standing by a truck that was partially blocking the road. Wright noticed "a big wet spot on the road" and a beer can behind the truck. Worwood got into the truck and pulled it off the road, presumably so that Wright could pass him.

¶ 3 Suspecting that Worwood had been drinking, Wright pulled up next to Worwood's truck. Wright did not identify himself as a police officer but stated that, given their small community, Worwood "knew who [he] was." From the driver's seat of Wright's truck, he asked Worwood if everything was all right. Worwood responded that he had pulled over to urinate. Wright observed that Worwood's speech was slow and slurred and that his eyes were bloodshot. Wright then exited his vehicle, approached Worwood, and while standing by Worwood's truck door, noticed the smell of alcohol. At some point during the encounter, Wright also observed a cooler that had been recently emptied.

¶ 4 From these facts, Wright determined that Worwood had "some alcohol in him," so he stepped out of his truck, walked over to Worwood, and stated, "[W]e'd better have a trooper look at you before you drive anymore."

¶ 5 Wright asked Worwood to step out of his own truck and get into Wright's truck. Without a means of contacting an on-duty officer in the canyon, Wright instructed Fautin to drive Worwood's truck down the canyon, call the police from the dairy at the bottom of the canyon, and reconvene at

Wright's house. Wright, in turn, drove Worwood a mile and a half down the canyon to Wright's own home, where they were met by on-duty Officer Kevin Wright.

¶ 6 Officer Kevin Wright performed four field sobriety tests on Worwood at Korey Wright's residence. Two tests, the horizontal gaze and nystagmus tests, determined possible intoxication from eye movement. The third required Worwood to walk nine steps, heel to toe, and turn. The fourth test required Worwood to stand on one leg for thirty seconds. When Worwood failed these tests, Officer Kevin Wright arrested him.

¶ 7 Worwood pled not guilty to the charge of driving under the influence with two prior convictions, a third degree felony.[1] He then filed a motion to suppress on the basis of alleged violations of the Fourth Amendment and article I, section 14 of the Utah Constitution. In view of the court of appeals' holding and the arguments of both parties, we limit our suppression analysis to the field sobriety tests.[2]

¶ 8 The district court denied the suppression motion. It found that the initial conversation between Wright and Worwood was consensual and did not amount to a detainment and that Wright's subsequent detention of Worwood fell within the bounds of a constitutional investigative detention.

¶ 9 After this ruling, Worwood entered a conditional guilty plea and appealed to the court of appeals. In a narrow holding, the appeals court affirmed, stating, "[W]e cannot conclude that an off-duty law enforcement officer exceeds the permissible scope of an investigatory detention when he transports a driver he suspects to be intoxicated a short distance from an uninhabited area to meet an on-duty officer for further investigation."[3]

Judge Thorne dissented, claiming that Wright's actions amounted to a de facto arrest.[4] Alternatively, Judge Thorne argued that under an investigative detention analysis, the duration and scope of the stop were unreasonable.[5]

¶ 10 We granted Worwood's petition for a writ of certiorari to determine "[w]hether delay in the performance of a field sobriety test and transportation of a suspect" are constitutional.

## STANDARD OF REVIEW

¶ 11 This court reviews the court of appeals' decision for correctness, with particular attention to whether the court of appeals reviewed the trial court's decision under the correct standard.[6] In cases involving Fourth Amendment questions under the United States Constitution, we review mixed questions of law and fact under a correctness standard in the interest of creating uniform legal rules for law enforcement.[7]

¶ 12 Factual findings underlying a motion to suppress are evaluated for clear error.[8] As the court of appeals correctly stated, parties challenging the facts under a clear error standard have a judicially imposed obligation to marshal the evidence in support of the challenged finding.[9] In his briefs to us and to the court of appeals, Worwood seems to dispute the district court's finding that Wright smelled alcohol on Worwood prior to detaining him in Wright's truck, but Worwood failed to actually challenge this finding by marshalling the evidence. We consequently accept the trial court's factual findings as conclusive. Because its findings are quite sparse, however,

---

1. Utah Code Ann. § 41–6a–503(2) (2005).

2. *See State v. Worwood*, 2005 UT App 539, ¶ 4, 127 P.3d 1265.

3. *Id.* ¶ 9.

4. *Id.* ¶ 13 (Thorne, J., dissenting).

5. *Id.* ¶ 16 (Thorne, J., dissenting).

6. *State v. King*, 2006 UT 3, ¶ 12, 131 P.3d 202; *State v. Rynhart*, 2005 UT 84, ¶ 9, 125 P.3d 938.

7. *State v. Levin*, 2006 UT 50, ¶ 23, 144 P.3d 1096; *State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699.

8. *Levin*, 2006 UT 50, ¶ 20, 144 P.3d 1096; *State v. Hansen*, 837 P.2d 987, 988 (Utah Ct.App. 1992).

9. *Worwood*, 2005 UT App 539, ¶ 3 n. 1, 127 P.3d 1265; *State v. Arguelles*, 2003 UT 1, ¶¶ 67–68, 63 P.3d 731.

we also look to the record consistent with the district court's findings.[10]

## ANALYSIS

¶ 13 We first consider Worwood's state constitutional claim, but find it to be procedurally barred. We then turn to Worwood's claims under the Fourth Amendment of the United States Constitution and find that Wright's initial encounter with Worwood was justified under reasonable suspicion. The scope and coercive nature of the stop, however, exceeded the constitutional bounds of an investigative detention. Because the field sobriety tests were conducted as a result of the unreasonable scope and coercive nature of the stop, we hold that the results of those tests must be suppressed.

## I. WORWOOD'S STATE CONSTI-TUTIONAL CLAIM IS PRO-CEDURALLY BARRED

¶ 14 We would have welcomed an analysis under article I, section 14 of the Utah Constitution; however, we find Worwood's state constitutional claim to be procedurally barred and inadequately briefed. We have repeatedly instructed counsel on the consequences of failing to properly preserve and develop a state constitutional law claim.[11] Still, this instruction bears repeating, given the frequency with which these claims are inadequately briefed before this court.

¶ 15 When interpreting state constitutional provisions that are similar or identical to those in the federal constitution, we encourage a primacy approach.[12] Under the primacy model, " 'a state court looks first to state constitutional law, develops independent doctrine and precedent, and decides federal questions only when state law is not dispositive.' "[13]

¶ 16 In developing an independent body of state search and seizure law, we have held that article I, section 14 of the Utah Constitution often provides greater protections to Utah citizens than the Fourth Amendment, despite nearly identical language.[14] In order to further develop state constitutional law, however, claims must be properly presented to this court.[15] In criminal cases, " 'specific preservation of claims of error must be made a part of the trial court record' " before the issue can be heard on appeal.[16] The issue must be " 'raised to a level of consciousness' " that allows the trial court an adequate opportunity to address it.[17] It follows, then, that perfunctorily mentioning an issue, without more, does not preserve it for appeal.[18] Although inapplicable in this case, a court may consider an unpreserved issue when plain error is apparent or in an exceptional circumstance.[19] Furthermore, in

---

10. *See, e.g., Brake,* 2004 UT 95, ¶¶ 2, 35 & n. 3, 103 P.3d 699; *State v. Warren,* 2003 UT 36, ¶ 2, 78 P.3d 590.

11. *See, e.g., Brigham City v. Stuart,* 2005 UT 13, ¶ 14, 122 P.3d 506, *reversed,* —— U.S. ——, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).

12. *See West v. Thomson Newspapers,* 872 P.2d 999, 1005–07 (Utah 1994).

13. *Id.* at 1006 (quoting Christine M. Durham, *Employing the Utah Constitution in the Utah Courts,* Utah B.J., Nov. 1989, at 26).

14. *See, e.g., State v. Thompson,* 810 P.2d 415, 418 (Utah 1991) (finding that Utah citizens have a "right to be secure against unreasonable searches and seizures" of their bank records, although the Fourth Amendment provides no such protection); *State v. Larocco,* 794 P.2d 460, 465–71 (Utah 1990) (providing greater state constitutional protection from warrantless vehicle searches than that provided under the Fourth Amendment).

15. *See State v. Harris,* 2004 UT 103, ¶ 23, 104 P.3d 1250; *State v. Calliham,* 2002 UT 86, ¶ 32 n. 8, 55 P.3d 573.

16. *State v. Johnson,* 774 P.2d 1141, 1144 (Utah 1989) (quoting *State v. Tillman,* 750 P.2d 546, 551 (Utah 1987)).

17. *State v. Cruz,* 2005 UT 45, ¶ 33, 122 P.3d 543 (quoting *State v. Brown,* 856 P.2d 358, 361 (Utah Ct.App.1993)); *accord State v. Cram,* 2002 UT 37, ¶ 9, 46 P.3d 230 ("[T]o preserve a claim or an objection for appellate review, the defendant must raise a timely or contemporaneous claim or objection.").

18. *Brown,* 856 P.2d at 361.

19. *State v. Holgate,* 2000 UT 74, ¶¶ 11–13, 10 P.3d 346; *State v. Irwin,* 924 P.2d 5, 7 (Utah Ct.App.1996).

part on the basis of the principle that preservation requires the lower court to be cognizant of a discreet issue, we have repeatedly refrained from engaging in state constitutional law analysis unless "an argument for different analyses under the state and federal constitutions is briefed." [20]

¶ 17 On some level, we understand counsel's hesitance to robustly address state constitutional issues in the lower courts. The similarity between the Fourth Amendment and article I, section 14 of the Utah Constitution plus the fledgling development of state search and seizure law makes some reliance on principles from federal cases likely. And because the federal search and seizure rules provide a floor from which state constitutional law can depart, interpretations of these provisions will oftentimes substantially overlap.[21] Finally, as a practical matter, trial courts may be reluctant to decide search and seizure issues on grounds that deviate from well-established, albeit murky, federal constitutional principles.

■■■ ¶ 18 Nevertheless, in keeping with our preservation policy, a state constitutional law argument must be raised in the trial court, preserved through the appellate process, and adequately briefed to us. As with most legal arguments, there is no magic formula for an adequate state constitutional analysis. Arguments based, for example, on historical context, the constitution's text, public policy, or persuasive authority would all meet our briefing requirements. But cursory references to the state constitution within arguments otherwise dedicated to a federal constitutional claim are inadequate. When parties fail to direct their argument to the state constitutional issue, our ability to formulate an independent body of state constitutional law is compromised. Inadequate briefing denies our fledgling state constitutional analysis the full benefit of the interest-

ed parties' thoughts on these important issues.

¶ 19 Throughout the appellate process, Worwood has claimed that his appeal is partially based on article I, section 14 of the Utah Constitution. No distinct legal argument or analysis supports this assertion, however. Instead, in motions and briefs to the trial court and the court of appeals, Worwood nominally relies on article I, section 14, but actually bases his argument exclusively on the Fourth Amendment. Worwood neither attempts any separate state constitutional analysis nor suggests that the two constitutional protections are anything but coextensive. In his brief to us, Worwood's state constitutional analysis is limited to the truism that article I, section 14 may provide greater protections to Utah citizens than the Fourth Amendment. But he failed to advance a unique state constitutional analysis. Because Worwood's state constitutional claim was neither properly preserved in the trial court, properly presented to the court of appeals, nor adequately briefed to us, we decline to reach it.

## II. WRIGHT'S ACTIONS VIOLATED THE FOURTH AMENDMENT

¶ 20 We now turn to Worwood's claim under the federal constitution and hold that the scope of Worwood's detention exceeded the constitutional bounds of an investigative detention, transforming it into a de facto arrest without probable cause. From the point when Wright required Worwood to get into Wright's truck for transport down Deep Canyon, Wright's actions were not reasonably necessary to further his investigation.

### A. Wright's Interaction with Worwood Was an Investigative Detention Requiring Reasonable Suspicion of Criminality

■■■ ¶ 21 The Fourth Amendment allows for three different kinds of police-citizen encounters, each permitting a different degree

---

**20.** *State v. Lafferty*, 749 P.2d 1239, 1247 n. 5 (Utah 1988); *accord Brigham City v. Stuart*, 2005 UT 13, ¶ 14, 122 P.3d 506 ("[W]e are resolute in our refusal to take up constitutional issues which have not been properly preserved, framed and briefed ...."), *reversed*, —— U.S. ——, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).

**21.** *See, e.g., State v. DeBooy*, 2000 UT 32, ¶ 12, 996 P.2d 546; *Soc'y of Separationists v. Whitehead*, 870 P.2d 916, 940 (Utah 1993) ("The federal rulings set the floor for federal constitutional protections which we must respect in interpreting the scope of our own constitution's provisions.").

of intrusion and requiring a different level of justification.

"(1) An officer may approach a citizen at any time and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an articulable suspicion that the person has committed or is about to commit a crime . . .; (3) an officer may arrest a suspect if the officer has probable cause to believe an offense had been committed or is being committed." [22]

¶ 22 Both parties concede that the encounter between Wright and Worwood was at least a seizure, rather than a consensual interaction. Consequently, we focus on the nature of an investigative detention, also known as a level two stop, and the kinds of actions that are justified in the course of such a detention.

▮▮▮▮ ¶ 23 Investigative detentions are bound by the Fourth Amendment.[23] Justification for an investigative detention exists when an officer has " 'reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.' " [24] Reasonable suspicion requires a "particularized and objective basis, supported by specific and articulable facts." [25] Courts should evaluate these facts in their totality, rather than looking at each fact in isolation.[26] Although the standard requires more than an " 'inchoate and unparticularized . . . hunch,' " it does not require an officer to rule out innocent conduct or establish the likelihood of criminal conduct to the same degree as required for probable cause.[27] When challenged, the state has the burden of proving the reasonableness of the officer's actions during an investigative detention.[28]

▮▮▮▮ ¶ 24 In considering the constitutionality of an investigative detention, we remain mindful of the Supreme Court's two initial justifications for allowing seizures based on reasonable suspicion, rather than on probable cause. First, a detention based on a reasonable and articulable suspicion is justified when the need to prevent "imminent criminal activity . . . outweigh[s] the . . . privacy interests implicated by a limited [investigatory] stop." [29] Second, a detention is supposed to involve a " 'wholly different kind of intrusion upon individual freedom' than a traditional arrest." [30] Because a detention is supposed to be less intrusive than an arrest, we are particularly cognizant of the level of coercion involved, given the suspected crime.[31] These justifications inform our analysis of the permissible boundaries of investigative detentions.

**22.** *State v. Markland*, 2005 UT 26, ¶ 10 n. 1, 112 P.3d 507 (quoting *State v. Johnson*, 805 P.2d 761, 763 (Utah 1991)).

**23.** *Id.* ¶ 10 (citing *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)).

**24.** *Id.* (quoting *State v. Chapman*, 921 P.2d 446, 450 (Utah 1996)).

**25.** *Black's Law Dictionary* 1273 (7th ed.1999).

**26.** *State v. Alverez*, 2006 UT 61, ¶ 14, 147 P.3d 425.

**27.** *Markland*, 2005 UT 26, ¶ 10, 112 P.3d 507 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

**28.** *Florida v. Royer*, 460 U.S. 491, 497–500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (holding that the state must prove that the seizure was "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure"); *United States v. Carhee*, 27 F.3d 1493, 1496 & n. 2 (10th Cir.1994).

**29.** *United States v. Sharpe*, 470 U.S. 675, 689, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (Marshall, J., concurring) (citing *Terry*, 392 U.S. at 26, 88 S.Ct. 1868).

**30.** *Id.* (quoting *Terry*, 392 U.S. at 26, 88 S.Ct. 1868; *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (indicating that intrusions based on reasonable suspicion rather than probable cause are justified only when they fall "short of the kind of intrusion associated with an arrest").

**31.** *Kaupp v. Texas*, 538 U.S. 626, 630–31, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (finding that a de facto arrest occurred when police took a scantily clad, adolescent suspect from his home in the middle of the night to police headquarters); *Hayes v. Florida*, 470 U.S. 811, 815–16, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) ("At some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments."); *Royer*, 460 U.S. at 499, 103 S.Ct. 1319 ("Detentions may be 'investigative' yet

1. Wright's Initial Stop of Worwood Was Justified Under Reasonable Suspicion

■ ¶ 25 Our analysis of the reasonableness of an officer's actions in the context of an investigative detention requires a dual inquiry.[32] We first consider "whether the officer's action was justified at its inception." [33] We next consider whether the length and scope of the detention are " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." [34]

■ ¶ 26 As to the first inquiry, Wright observed articulable facts that Worwood had been or was about to drive under the influence, which justified his initial stop. He saw a large water spot on the road, a crushed beer can, and later, a cooler. He saw Worwood behind the wheel of his truck. He also smelled alcohol on Worwood's breath. This evidence justified Wright's reasonable suspicion of criminal activity and some intrusion into Worwood's personal liberty.

2. Considering the Totality of the Circumstances, the Scope of Worwood's Detention Exceeded that Justified Under Reasonable Suspicion and Constituted a De Facto Arrest

■ ¶ 27 We next consider the reasonableness of the investigative detention's scope and duration. Because the constitutionality of an investigative detention turns on the interconnection between the purpose of the stop and its subsequent scope, the specific means of detention used by the police in one instance does not create the outer limit for a constitutional investigative detention in every case.[35]

■ ¶ 28 In evaluating the scope of a stop, the court should foremost consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." [36] That being said, officers are not required to use the least intrusive means available in pursuing their investigation; the question is merely "whether the police acted unreasonably in failing to ... pursue" alternatives.[37] The reasonableness of a detention should be evaluated on the basis of the totality of the circumstances facing the officer, not on judicial second-guessing.[38] The court should consider whether " 'the circumstances, viewed *objectively*, justify [the] action,' " "regardless of the individual officer's state of mind." [39] While an officer's subjective inferences based on the objective facts affect a court's determination of whether reasonable suspicion exists, improper subjective motiva-

---

violative of the Fourth Amendment absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not ... seek to verify their suspicions by means that approach the conditions of arrest."); *Dunaway*, 442 U.S. at 212, 99 S.Ct. 2248 (taking a suspect from a neighbor's home in a police car to a police station interrogation room is "in important respects indistinguishable from a traditional arrest").

**32.** *Terry*, 392 U.S. at 19–20, 88 S.Ct. 1868.

**33.** *Id.* at 20, 88 S.Ct. 1868.

**34.** *Id.* at 19, 88 S.Ct. 1868 (quoting *Warden v. Hayden*, 387 U.S. 294, 310, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (Fortas, J., concurring)); *Sharpe*, 470 U.S. at 682, 105 S.Ct. 1568; *State v. Johnson*, 805 P.2d 761, 763 (Utah 1991).

**35.** *People v. Celis*, 33 Cal.4th 667, 16 Cal.Rptr.3d 85, 93 P.3d 1027, 1032–33 (2004) (finding that brandishing weapons and handcuffing a drug trafficking suspect was justified given the suspected crime, but acknowledging that a routine traffic stop would "rarely justify" a comparable police response).

**36.** *Sharpe*, 470 U.S. at 686, 105 S.Ct. 1568 (citing *Michigan v. Summers*, 452 U.S. 692, 701 n. 14, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)).

**37.** *Id.* at 687, 105 S.Ct. 1568.

**38.** *Id.* at 686–87, 105 S.Ct. 1568; *State v. Warren*, 2003 UT 36, ¶ 14, 78 P.3d 590.

**39.** *Brigham City v. Stuart*, —— U.S. ——, ——, 126 S.Ct. 1943, 1948, 164 L.Ed.2d 650 (2006) (quoting *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)); *accord Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (indicating that a Fourth Amendment reasonableness inquiry requires the court to consider "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation"); *State v. Lopez*, 873 P.2d 1127, 1136–38 (Utah 1994) ("[S]ubjective focus on the officer's state of mind at the time of the stop is inconsistent with Fourth Amendment law.").

tions do not negate what would otherwise be a reasonable search based on objectively reasonable facts.[40]

■ ¶ 29 Given the facts of this particular investigative detention, we pause to consider the circumstances under which extending the length of an investigative detention to transport a suspect to another location is justified under reasonable suspicion. An officer's concerns about safety and security can justify extending the scope of an investigative detention.[41] Transporting a suspect to a known crime scene or to the location of a known witness is often justified as the most expeditious means of achieving the purpose of the initial stop.[42]

■ ¶ 30 But transporting a suspect can change the level of coercion involved in an investigative detention to the degree that it is no longer justified under reasonable suspicion. An investigatory detention can become so intrusive that it escalates into a de facto arrest.[43] For instance, moving a suspect from a public place to an enclosed, police-dominated location can change the level of justification required from reasonable suspicion to probable cause.[44] On the other hand, transporting a defendant may be benign when the movement does not change the level of coercion involved in the stop. For example, an investigative detention is not necessarily transformed into a de facto arrest when the suspect is moved a short distance from one public place to another.[45] We agree with the court of appeals' analysis in *State v. Chism* that "[i]nvestigative acts that are not reasonably related to dispelling or resolving the articulated grounds for the stop are permissible only if they do not add to the delay already lawfully experienced and do not represent any further intrusion on the detainee's rights." [46]

¶ 31 While we are cognizant that there may be circumstances when moving a suspect is necessary because of safety and security concerns, such circumstances are not evident in this case. Although the initial encounter occurred on a dirt road, Wright did not indicate that the road conditions prohibited him from conducting field sobriety tests. He made no indication that the grade, pitch, or width of the road created safety concerns that prohibited him from conducting such tests, and we find no objective facts in the record indicating that such a concern would have been reasonable. There is no indication of traffic and no indication that the weather or time of day prevented Wright from accurately conducting the tests. There is no indication that Wright was concerned about his safety, having come upon the situation while off-duty, in his private car, and unarmed. Further, there is no indication that Worwood was belligerent or even uncooperative. Although the record is silent on

40. *State v. Alverez*, 2006 UT 61, ¶ 15, 147 P.3d 425.

41. *Florida v. Royer*, 460 U.S. 491, 504–05, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

42. *See, e.g., In re Carlos M.*, 220 Cal.App.3d 372, 269 Cal.Rptr. 447, 452 n. 4, 452–55 (1990) (holding that an officer was expeditiously pursuing his investigation when he transported two suspects to a hospital to be identified by a rape victim).

43. *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (holding that a detention where a suspect was "taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room" "was in important respects indistinguishable from a traditional arrest").

44. *Id.; Royer*, 460 U.S. at 502–03, 103 S.Ct. 1319 (holding that a suspect interrogated in "a police interrogation room" while the police held his airline ticket, identification, and luggage was "[a]s a practical matter ... under arrest"); Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.2(g) (4th ed.2004) (indicating that a change in the degree of coerciveness may "justify the conclusion that the movement of a suspect has transformed the stop into an arrest even though the relocation was not to a police facility").

45. *See United States v. Nurse*, 916 F.2d 20, 22, 24 (D.C.Cir.1990) (escorting a defendant into the main public concourse of a train station from an outside taxi stand did not change the level of coercion enough to exceed the limitations of reasonable suspicion); *United States v. Mendenhall*, 446 U.S. 544, 563, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (Powell, J., concurring) (detaining a suspect in a public place is less coercive than detention where the suspect is "isolated from assistance").

46. 2005 UT App 41, ¶ 15, 107 P.3d 706 (citation, internal quotation marks, and brackets omitted).

these potentially determinative factors, had any of them been present, a more expansive detention may have been justified under reasonable suspicion.

¶ 32 Next, Worwood was not detained and transported to expedite the conclusion of the investigatory detention; if anything, Wright's actions prolonged the investigative detention with no justifiable purpose. After ascertaining that Worwood had slurred speech and bloodshot eyes and smelled of alcohol, the next reasonable step to confirm or dispel Wright's suspicions was to conduct field sobriety tests. Instead of taking this step, Wright instructed Worwood to get into Wright's truck, drove him down Deep Canyon, and detained him at Wright's private residence until an on-duty officer arrived to conduct field sobriety tests. These actions were unreasonable because there is no indication in the factual record that Wright was unable to conduct field sobriety tests at the initial scene of the stop.

¶ 33 Finally, the facts of Worwood's detention in their totality push the coercive nature of this detention beyond the narrow bounds of a constitutional investigative detention. Wright's statement to Worwood that "we'd better have a trooper look at you before you drive anymore" indicates that compliance was mandatory. Worwood was then detained in Wright's vehicle, and his truck was driven away by a stranger—Skylar Fautin—while Worwood remained in Wright's truck. Wright drove Worwood to Wright's personal residence to await the arrival of Officer Kevin Wright. Whether Worwood sat in the back or front of Wright's vehicle and whether Worwood was detained inside or outside of Wright's residence are unknown facts that may also bear on the level of coercion. Had concerns about safety, security, or the need to expedite the investigation justified Wright's movement of Worwood, these unknown facts may have been critical. In this case, however, the fact that Worwood was

placed in Wright's truck and moved to Wright's private residence increased the level of coercion without justification. Consequently, we find that Wright's detention of Worwood exceeded the permissible scope of a constitutional investigative detention.

3. Wright Did Not Have Probable Cause to Justify a De Facto Arrest

■■■ ¶ 34 Because Worwood's detention amounted to a de facto arrest, we now consider whether there was probable cause to justify an arrest. "Probable cause exists where the facts and circumstances within the officer's knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." [47]

¶ 35 During the course of the stop, Wright smelled alcohol and observed Worwood's bloodshot eyes and slurred speech. Utah courts generally find that probable cause for DUI exists when slurred speech, bloodshot eyes, and the smell of alcohol are accompanied by failed field sobriety tests.[48] However, in *American Fork City v. Singleton,* the court of appeals found probable cause for DUI without the benefit of field sobriety tests when the suspect had "glassy, bloodshot eyes," swayed when he walked, and became belligerent when asked to take a field sobriety test.[49] But there was more evidence of the suspect's possible drunkenness in *Singleton* than was present here, including at least one piece of evidence typically garnered from a traditional field sobriety test: unsteady walking.

¶ 36 We conclude that Worwood's bloodshot eyes and slurred speech and the smell of alcohol did not provide sufficient trustworthy information for Wright to conclude that Worwood had exceeded the legal alcohol limit. Consequently, there was no probable cause for Worwood's de facto arrest. Further, con-

47. *State v. Menke,* 787 P.2d 537, 542 (Utah Ct. App.1990) (citation, internal quotation marks, and brackets omitted).

48. *See State v. Vialpando,* 2004 UT App 95, ¶¶ 3–4, 89 P.3d 209; *Layton City v. Noon,* 736 P.2d 1035, 1038 (Utah Ct.App.1987). *But see Commonwealth v. Eckert,* 431 Mass. 591, 728 N.E.2d

312, 319 (2000) (finding probable cause exclusively from observations of red and watery eyes, slurred speech, and the smell of alcohol).

49. 2004 UT App 172U, para. 3, 2004 WL 1368211.

cluding otherwise would essentially eliminate any incentive for officers to conduct field sobriety tests, a policy outcome that would introduce needless subjectivity and potential abuse into drunk driving assessments.

### 4. Sufficiency of Worwood's Suppression Motion

¶ 37 Before proceeding to our suppression analysis, we pause to consider the dissent's contention that Worwood's challenge below was so ill-defined that the State could not adequately address his suppression motion. After carefully reviewing the record, we conclude that Worwood made and preserved before the trial court the arguments that he later made on appeal. In his initial memorandum in support of his motion to suppress, Worwood established multiple bases for challenging the constitutionality of Wright's stop. First, Worwood argued that Wright's actions constituted a seizure. Second, after reciting the appropriate legal standard and the specific facts surrounding this stop, Worwood argued that "the officer lacked sufficient objective facts to constitute reasonable suspicion or probable cause to arrest." Third, Worwood alternatively argued that if the court finds reasonable suspicion, "the detention was unreasonable as to scope and length of time." Finally, Worwood argued that he was unconstitutionally arrested because he "was taken into custody ... and not free to leave at the scene of the police encounter."

¶ 38 Throughout its opposition to Worwood's suppression motion, the State never argued that Worwood's federal challenge was vague, incomplete, or lacking requisite specificity. Additionally, at the preliminary hearing on the suppression motion, the State and Worwood had equal opportunity to illicit relevant facts from both Kevin Wright and Korey Wright. We accordingly reject the dissent's suggestion that Worwood's suppression motion was inadequate or that the State viewed it as such.

¶ 39 It has long been the law that once a defendant adequately challenges a warrantless seizure, the State bears the burden of proving the reasonableness of law enforcement's action. In order to meet his initial burden of production,[50] a defendant seeking to suppress evidence must articulate how law enforcement's action infringed the Fourth Amendment.[51] On the basis of our review of the record, we find that Worwood's Fourth Amendment challenge was quite adequate. He clearly challenged the constitutionality of the initial stop, as well as the scope of the stop, and supported that challenge with factual references.

¶ 40 Once a valid constitutional challenge is made, the burden shifts to the State to prove that its warrantless action was justified.[52] And a dearth of evidence cannot be assumed to support the reasonableness of an officer's actions during an investigative detention. Such an assumption turns this well-established proof requirement on its head. The United States Supreme Court has long held that "[i]t is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure."[53] Officers, and conse-

---

**50.** *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir.1977) ("[T]he burden of production and persuasion generally rests upon the movant in a suppression hearing ... [;] [however,] if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search."); *United States v. Crocker*, 510 F.2d 1129, 1135 (10th Cir.1975) ("Logic dictates that a pre-trial Motion to Suppress filed by an accused does in fact cast the burden upon the movant to present facts necessary to sustain his position.").

**51.** *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir.1994) ("As to the warrantless encoun-

ter, [the defendant] bears the burden of proving whether and when the Fourth Amendment was implicated.... The government then bears the burden of proving that its warrantless actions were justified....").

**52.** *Id.; United States v. Roch*, 5 F.3d 894, 897 (5th Cir.1993); Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* 11.2(b), at 42 (4th ed. 2004) ("[I]f the police acted without a warrant the burden of proof is on the prosecution.").

**53.** *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

quently the state, are burdened by the requirement of reasonableness throughout an investigative detention because of the "Fourth Amendment's general proscription against unreasonable searches and seizures." [54] This burden is not contingent on what specific evidence is challenged in a defendant's suppression motion, but rather on the nature of the constitutional challenge.

## B. The Field Sobriety Tests Must Be Suppressed as Evidence Obtained from an Unconstitutional Detention

¶ 41 Having concluded that the field sobriety tests were conducted after an unconstitutionally expansive investigatory detention of Worwood, we next consider whether the tests are subject to suppression. Because we find that the field sobriety tests were obtained as a result of Worwood's illegal detention, we reverse the court of appeals' affirmation of the district court's denial of Worwood's suppression motion.

¶ 42 When applicable, the exclusionary rule keeps out of trial evidence primarily or derivatively obtained through a violation of an individual's constitutional rights (the "fruit" of unconstitutional police conduct).[55] It was first adopted to deter unlawful police conduct by preventing police from benefiting from activities violative of the Fourth Amendment.[56] Because of the high social cost attendant with suppressing evidence,[57] however, the rule is not operable when the evidence in question has been cleansed of the taint of illegality, a circumstance that can occur in a number of different ways.[58]

¶ 43 Evidence will not be excluded as fruit of an illegal search or seizure if the illegality is not the "but for" cause of the evidence's discovery.[59] The causal chain between the illegality and the discovered evidence can be broken if the evidence was also "discovered through independent and lawful activity"—in other words, through an independent source.[60] The independent source doctrine has a forward-looking corollary in the inevitable discovery doctrine. While the independent source doctrine looks at what was actually discovered, the inevitable discovery doctrine considers what hypothetically would have been discovered.[61] For courts to apply the inevitable discovery doctrine, "there must be persuasive evidence of events or circumstances apart from those resulting in illegal police activity that would have inevitably led to discovery." [62] In sum, the independent source and inevitable discovery doctrines are two ways that the causal link between the initial illegality and the evidence can be broken.

¶ 44 Even if the illegality is the "but for" reason for the evidence's discovery, it should still be admitted if it is "sufficiently attenuated to dissipate the taint" of the illegality.[63] The court asks whether the challenged evidence was obtained " 'by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint.' " [64] Attenuation can occur if the connection between the illegality and the evidence is too remote.[65] It

---

54. *Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

55. *State v. Topanotes*, 2003 UT 30, ¶ 13, 76 P.3d 1159.

56. *Weeks v. United States*, 232 U.S. 383, 393–98, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

57. *Hudson v. Michigan*, — U.S. —, —, 126 S.Ct. 2159, 2163, 165 L.Ed.2d 56 (2006) (citing *United States v. Leon*, 468 U.S. 897, 907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).

58. *Topanotes*, 2003 UT 30, ¶¶ 13–14, 76 P.3d 1159.

59. *Hudson*, 126 S.Ct. at 2164; *Segura v. United States*, 468 U.S. 796, 815, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

60. *Topanotes*, 2003 UT 30, ¶ 13, 76 P.3d 1159.

61. *Id.* ¶ 14.

62. *Id.* ¶ 16.

63. *Segura*, 468 U.S. at 815, 104 S.Ct. 3380.

64. *Id.* at 804–05, 104 S.Ct. 3380 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

65. *Hudson*, 126 S.Ct. at 2164; *Wong Sun*, 371 U.S. at 491, 83 S.Ct. 407.

can also occur if "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." [66] As a final policy consideration, the exclusionary rule is applicable only "where its deterrence benefits outweigh its substantial social costs." [67]

¶ 45 The State argues that the challenged field sobriety test results were "conducted on the basis of pre-detention reasonable suspicion." The State argues that because there was a constitutional basis for the field sobriety tests without the illegal detention, the evidence was not obtained by exploiting the initial illegality. In short, the State argues that there was no causal chain linking the Fourth Amendment violation to the field sobriety tests.

¶ 46 In support of this argument, the State cites cases in which the causal links between the illegality and the evidence were never established. For instance, in *United States v. Ibarra–Sanchez,* officers found evidence of a crime after conducting a legal stop but an illegal arrest.[68] Because the probable cause that led to the discovery of the challenged evidence was the fruit of the legal stop rather than the illegal arrest, there was no causal connection between the illegal arrest and the discovered evidence.[69] And in *Hudson v. Michigan,* police had enough evidence to establish probable cause and obtain a warrant, but violated the knock-and-announce rule.[70] The Court stated that "the constitutional violation of an illegal *manner* of entry was *not* a but-for cause of obtaining the evidence. Whether that preliminary misstep had occurred *or not,* the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house." [71]

¶ 47 The circumstances of both cases differ from those present here. Unlike *Ibarra–Sanchez* and *Hudson,* Worwood's illegal detention was the but-for cause of Officer Kevin Wright's administration of the field sobriety tests at Wright's home. There was no intervening event to break the causal chain. The fact that before the illegality reasonable suspicion would have justified further investigation does not break the actual linkages between the illegal detention and the field sobriety tests. Investigations under reasonable suspicion do not have a shelf life, unlike a transportable warrant. An officer must either confirm the suspicion by establishing probable cause for arrest or dispel the suspicion and release the suspect. Wright took neither constitutional path. Instead, he not only exploited the illegality in order to obtain the evidence needed for probable cause, he arguably created the illegality in order to obtain the evidence without conducting the arrest himself. The field sobriety tests would not have been obtained absent the illegality or different choices by Wright.

¶ 48 Under our decision in *State v. Topanotes,*[72] we cannot assume that Wright would have conducted a field sobriety test at the scene of the initial encounter if he had not chosen to illegally transport Worwood. In *Topanotes,* officers retained the defendant's identification during a consensual stop, elevating the stop to one requiring reasonable suspicion.[73] A subsequent warrants check revealed two outstanding arrest warrants.[74] In the search incident to arrest, officers found heroin on the defendant.[75] Relying on the defendant's cooperative nature throughout the stop, the State argued that the heroin would have been inevitably discovered had

---

66. *Hudson,* 126 S.Ct. at 2164, 2165 (holding that the interests protected by the knock and announce rule "ha[d] nothing to do with the seizure of the evidence").

67. *Id.* at 2163 (citation and internal quotation marks omitted).

68. 203 F.3d 356, 357 (5th Cir.2000) (per curiam).

69. *Id.* at 357.

70. —— U.S. ——, ——, 126 S.Ct. 2159, 2162, 165 L.Ed.2d 56 (2006).

71. *Id.* at 2164.

72. 2003 UT 30, 76 P.3d 1159.

73. *Id.* ¶¶ 2, 5.

74. *Id.* ¶ 3.

75. *Id.*

the defendant not been unlawfully detained.[76] We rejected this argument, reasoning that just because the defendant was cooperative while her identification was seized, that did not mean that she would have been cooperative if she had been truly free to leave.[77]

¶ 49 We reaffirm our conclusion in *Topanotes* that "[c]ases that rely upon individual behavior as a crucial link in the inevitable discovery chain, particularly when that behavior is heavily influenced by the illegality that did occur, rarely sustain an inevitable discovery theory."[78] Absent the illegality, Wright may have conducted the field sobriety tests on the roadside, but he may have just as likely released Worwood to avoid the trouble of making an off-duty arrest.

¶ 50 Finally, we find that the deterrent benefits of suppression in this case clearly outweigh its social costs. Allowing an officer to capriciously move a defendant without fear that subsequently obtained evidence would be suppressed creates an incentive for police misconduct. Denying the defendant's suppression motion encourages an "if we hadn't done it wrong, we would have done it right" defense, insulating officers from any repercussions from unconstitutionally extending investigative detentions.[79]

## CONCLUSION

¶ 51 Under the Fourth Amendment, we find that the scope of Worwood's detention exceeded the bounds of a constitutional investigative stop. Although Wright's initial stop of Worwood was justified under reasonable suspicion, the subsequent detention was needlessly extended from the point when Worwood was confined in Wright's truck. As the field sobriety tests were discovered because of the unreasonably excessive scope of the investigatory detention, we hold that the results of the tests should be suppressed. We remand this case to the court of appeals to remand to the district court for a ruling consistent with this opinion.

¶ 52 Chief Justice DURHAM, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH'S opinion.

WILKINS, Associate Chief Justice, dissenting:

¶ 53 I respectfully dissent.

¶ 54 My colleagues conclude that the off-duty officer's initial "stop" of Worwood was constitutionally justified, and that further investigation could have been undertaken at that time by use of field sobriety tests without offense to the constitution. However, they also conclude that the constitution is offended by the off-duty officer transporting Worwood from the rural mountain dirt road where he was discovered behind the wheel of his vehicle smelling of alcohol with bloodshot eyes and slurred speech. This, they conclude, results in a de facto arrest without adequate justification. I disagree.

¶ 55 Worwood filed a motion to suppress "the evidence" due to unspecified and unidentified violations of the Fourth Amendment and article I, section 14 of the Utah Constitution. He made no argument based upon the alleged violation of the state constitutional provision he cited. He did little more with the federal constitutional claim.

¶ 56 On the basis of this thin legal effort, the State was required to respond in defense of the acts of the off-duty officer in moving Worwood down the Deep Canyon road a mile and a half to meet an on-duty officer who had the communication, record-keeping, security, and containment equipment not possessed by the off-duty officer when he chanced to encounter Worwood on the mountain road. Against the ill-defined challenge leveled by Worwood, the State presented evidence of the actions and circumstances surrounding the eventual formal arrest of Worwood, a serial drunk driver. We do not know from the record before us what evidence was available to the State but not presented at the time of the trial court hearing on Worwood's

76. *Id.* ¶ 19.

77. *Id.* ¶ 20.

78. *Id.*; *cf. Segura,* 468 U.S. at 816, 104 S.Ct. 3380 (declining to assume that the defendant and

her cohorts would have destroyed the evidence sought in the warrant had the initial illegal entry not occurred).

79. *Topanotes,* 2003 UT 30, ¶ 19, 76 P.3d 1159.

motion to suppress "the evidence" against him. Had Worwood presented a clear and concise challenge to the degree of detention to which he had been subjected, and the basis upon which he considered the objective facts surrounding that detention to have been inadequate as a matter of constitutional law, the State may well have been able to address those challenges. Although the State bears the burden of proving the reasonableness of an officer's actions during an investigative detention, that burden arises only when the actions and their reasonableness have been challenged. Such a challenge has to be recognizable to be sufficient.

¶ 57 As my colleagues note, there are many probative and useful facts that we cannot discern from the record. For example, we do not know what concern the road conditions at the time of the first contact may have presented. We do not know the grade, width, pitch, surface quality, or other condition of the road surface. We know not the weather, time of day, light conditions, or other site factors that might have influenced the off-duty officer's decision to move Worwood down canyon to investigate further. We do not know if the officer was concerned about his safety, or that of his companion, or of Worwood, since the officer was in his private vehicle, unarmed, without communication equipment, and off-duty. We do not know if Worwood was uncooperative, or even belligerent, or if the officer was aware of Worwood having a reputation for resistant behavior. We do not know why the officer took Worwood the additional mile and one half to meet an on-duty officer. We do not know if Worwood was required to ride in front or back of the off-duty officer's vehicle, or whether he was taken inside or remained outside of the residence to which he was taken to meet the on-duty officer.

¶ 58 We do not know from the record whether or not Worwood was unsteady on his feet at the time he moved from his truck to the off-duty officer's vehicle. This alone may have been enough to justify Worwood's arrest without administration of field sobriety tests.

¶ 59 All of these unknown objective facts were within the personal knowledge of the off-duty officer, and presumably could have been competently testified to at the time of Worwood's motion to suppress "the evidence" against him. Had they been placed in contest by Worwood, it is difficult to imagine that the State, when it had the off-duty officer on the stand, would not have sought to present the evidence to the trial court.

¶ 60 Unlike my colleagues, I conclude that the objective facts in the record are sufficient to justify the actions of the off-duty officer. In addition, given the inadequate challenge mounted by Worwood, the State has adequately defended those actions. Only by virtue of a careful analysis made for the first time on appeal, and by the court at that, has Worwood finally produced a meaningful challenge. The State, and the off-duty officer, have been denied any opportunity to prove the reasonableness of the actions taken by the failure of the challenger to raise the questions now found to be so troubling by my colleagues.

¶ 61 Finally, I am troubled by the suggestion in the majority opinion that the "benefits" of suppression of the field sobriety tests against Worwood "clearly outweigh the social costs." This cost-benefit analysis appears to rely heavily on two presumptions with which I do not agree: first, that not suppressing the evidence of drunk driving in this instance would create an incentive for law enforcement officers to knowingly violate the law as embodied in the United States Constitution; and second, that the consequences of repeat drunk driving are preferred to those of the incentive our decision would create to violate the law.

¶ 62 In response, I believe the perverse incentive feared by my colleagues is a fiction. I believe the suppression of otherwise valid incriminating evidence against an accused wrong-doer has little impact on police conduct. Those officers genuinely devoted to the fair and reasonable application of the law will do exactly as they do now: they will continue to seize drugs found in transit, stop crimes in progress, and struggle to understand and apply the myriad decisions of the various courts restricting their scope of action. Those few, and I do believe it is a very small minority of all law enforcement offi-

cers, who knowingly violate the law in their efforts to enforce it, will continue to do so, but with greater care in how it is reported and recorded. Neither category of officer will be any more likely to abide the law than they already were prior to our decision today.

¶ 63 In addition, I believe the scourge of death and devastation brought to unsuspecting and innocent others by those who choose to drive under the disabling influence of alcohol or drugs is the greater social evil at issue in this case.

¶ 64 Without regard to these beliefs and policy concerns, it is my view that the law dictates a different result in this case than that arrived at by my colleagues. To be perfectly clear: I am not of the view that failings in Worwood's initial suppression motion lessen the State's burden to prove the reasonableness of the officer's conduct. It is simply my view that the initial burden falls upon the defendant to present to the trial court a clearly articulated challenge, or to suffer the risks that his challenge will be unsuccessful, as here. We require parties to place their opponents and the court on notice of the boundaries of the dispute. This is intended to assist the court in identifying and making just and fully informed decisions. Moreover, the proponent of the motion has the burden of proving the factual predicate of the action sought. A proponent failing to do so is not entitled to relief.

¶ 65 I would affirm the court of appeals, the decision of the trial court, and the conviction of Mr. Worwood.