2004 UT 38

**David L. BRADSHAW, Petitioner,**

v.

**WILKINSON WATER COMPANY, and the Public Service Commission of Utah, Respondents.**

No. 20020233.

Supreme Court of Utah.

May 4, 2004.

J. Craig Smith, D. Scott Crook, Salt Lake City, for Bradshaw.

William N. White, David C. Wright, Salt Lake City, for Wilkinson Water Co.

Mark L. Shurtleff, Att'y Gen., Kent L. Walgren, Asst. Att'y Gen., Sander J. Mooy, Salt Lake City, for Public Service Commission.

PARRISH, Justice:

¶ 1 In this case, we are asked to decide whether the Utah Public Service Commission (the "Commission") erred when it required a real estate developer to bear a share of the

costs of constructing facilities necessary for a local utility to supply water to the developer's proposed subdivision. We also are asked to decide whether the Commission erred in determining that the additional demand for water attributable to the proposed subdivision may require the construction of additional facilities. We affirm the decision of the Commission on both issues.

## BACKGROUND

¶ 2 Real estate developer David Bradshaw sought a commitment from Wilkinson Water Company ("Wilkinson Water") to supply water to a subdivision he plans to develop. Wilkinson Water is a local water utility that supplies water to approximately 194 lots using two wells and three storage tanks. Bradshaw's proposed subdivision contains twenty-one individual residential lots.

¶ 3 In response to Bradshaw's request for a service commitment, Wilkinson Water took the position that its existing tanks, wells, and pipes were insufficient to meet the anticipated demands of the proposed development. Accordingly, Wilkinson Water conditioned its service commitment on Bradshaw's agreement to pay a proportionate share of the costs associated with construction of the additional infrastructure.

¶ 4 When Bradshaw and Wilkinson Water could not reach agreement with respect to Bradshaw's responsibility for infrastructure costs, Bradshaw filed a complaint with the Public Service Commission and sought a hearing. Bradshaw disputed the need for construction of additional facilities and argued that even if new facilities were necessary, he should not be required to bear any of the associated costs. Specifically, Bradshaw argued that the tariff governing Wilkinson Water required it to provide water to each of Bradshaw's lots for no more than the connection fee required of an individual residential customer.

¶ 5 Following a hearing, an administrative law judge ruled in favor of Wilkinson Water. He found that Wilkinson Water's existing system was operating at or near capacity for both source and storage resources, thereby necessitating construction of additional facilities. He further found that Wilkinson Water did not violate the terms of its tariff when it required Bradshaw to pay a portion of the costs of constructing the additional facilities.

¶ 6 Bradshaw sought reconsideration of the decision by the Commission. The Commission granted Bradshaw's request, and affirmed the decision of the administrative law judge. The Commission found that the terms of the Wilkinson Water tariff were not applicable in this situation. The Commission further found that Bradshaw had not advanced sufficient reason for departing from the Commission's policy of requiring that real estate developers bear the cost of expanding utility capacity to meet the anticipated needs of speculative developments. The Commission therefore ordered that Bradshaw "be required to provide for a proportionate share of reasonable costs of reasonably necessary water plant installed or required to provide utility service to the proposed subdivision."

¶ 7 Bradshaw sought a writ of review of the Commission's order from this court. We have jurisdiction over review of final orders of the Public Service Commission pursuant to section 78–2–2(3)(e)(i) of the Utah Code. Utah Code Ann. § 78–2–2(3)(e)(i) (2002).

## ANALYSIS

¶ 8 Bradshaw advances two arguments in support of his challenge to the Commission's order. First, Bradshaw argues that Wilkinson Water's tariff requires it to shoulder the entire cost of any additional infrastructure required to provide service to his proposed development. In the alternative, he argues that he cannot be required to pay for any additional infrastructure because the evidence presented to the Commission establishes that Wilkinson Water's existing facilities are adequate to serve his proposed development. We address each argument in turn.

### I. APPLICATION OF THE WILKINSON WATER TARIFF

¶ 9 The Commission examined Wilkinson Water's tariff and held that none of its provi-

sions are applicable to this case. Because it found the tariff inapplicable, the Commission applied its well-established policy requiring that developers pay the proportionate share of infrastructure costs associated with their proposed developments.

¶ 10 The tariff contains a "Facility Extension Policy"[1] that explains the respective allocation of costs between Wilkinson Water and its customers when a *customer* obtains an "extension" of Wilkinson Water's lines of service to the customer's property. The Commission held that the Facility Extension Policy does not govern cost allocation for additional facilities necessary to supply a proposed subdivision. It reasoned:

> [T]he Facility Extension Policy [is] applicable to a customer or prospective customer who requires an extension of [Wilkinson Water's] facilities in order to begin his own consumption of water services offered by the Company.... This is not Mr. Bradshaw's situation. Mr. Bradshaw would require Wilkinson Water to expand and upgrade facilities, not to meet Mr. Bradshaw's own water service consumption, but to be prepared to serve possible, future customers in his proposed development.

¶ 11 We accord the Commission's tariff interpretations "considerable deference and review them for mere reasonableness or rationality." *McCune & McCune v. Mountain Bell Tel.*, 758 P.2d 914, 918 (Utah 1988). Although the Commission's interpretation of a tariff is entitled to deference, its interpreta-

tion must be lawful. "One of the requirements for a finding of reasonableness [of a Commission tariff interpretation] is lawfulness; a minimally reasonable interpretation must avoid unnecessarily contravening general law." *Id.*

¶ 12 Bradshaw asserts that the Commission made two errors in interpreting Wilkinson Water's tariff. First, Bradshaw contends the Commission's interpretation would render the tariff unlawful because it would allow unlawful discrimination against him. Second, Bradshaw argues the tariff should have been construed strictly against the utility pursuant to *Josephson v. Mountain Bell*, 576 P.2d 850, 852 (Utah 1978).

### A. The Commission Appropriately Recognized a Distinction Between Real Estate Developers and Individual Utility Customers

¶ 13 The Commission's holding that the tariff does not apply in this case is based on a distinction between prospective customers who seek water service for their own imminent consumption and real estate developers who seek commitments to serve lots they intend to sell to others. Bradshaw argues that the terms of the tariff recognize no such distinction and therefore he should be considered a customer in the same way as an individual who requests service on his own behalf.

¶ 14 Utah law prohibits public utilities from engaging in disparate treatment of sim-

---

1. The "Facility Extension Policy" in Wilkinson Water's tariff provides:

 1. *Extensions.* An extension is any continuation of, or branch from, the nearest available existing line of the Company, including any increase in capacity of an existing line to meet the customer's requirement.
 2. *Costs.* The total cost of extensions, including engineering, labor and material shall be paid by the applicants. Where more than one applicant is involved in an extension, the costs shall be prorated on the basis of the street frontage distances involved. Sufficient valves and fire hydrants shall be included with every installation.
 3. *Construction Standards.* Minimum standards of the Company shall be met, which standards shall also comply with the standards of the Utah State Bureau of the Environmental Health. Pipe sizes shall be designed by the

 Company, but the size shall never be smaller than 4".
 4. *Ownership.* Completed facilities shall be owned, operated, and maintained by the Company including and through the meters, as detailed in the Tariff Rules and Regulations.
 5. *Water Storage and Supply.* All costs for providing needed water supply and storage shall be paid by the Company. This cost shall include the installation and operation of pumps as required for proper pressure regulation of the system.
 6. *Temporary Service.* The customer will pay the total cost for the installation and removal of any extensions for service to a venture of a temporary or speculative permanency. The Company will receive the estimated cost from the customer before beginning work on the extension.

ilarly situated customers, Utah Code Ann. § 54–3–8 (2003),[2] and requires that a utility's charges be "just and reasonable," *id.* § 54–3–1. Utah law recognizes, however, that not all customers are similarly situated. "The scope [of the] definition of 'just and reasonable' may include, but shall not be limited to, the cost of providing service to each category of customer, economic impact of charges on each category of customer, and on the well-being of the state of Utah . . . ." *Id.*

¶ 15 Bradshaw argues that he is similarly situated to an individual lot owner and that the Commission erred in treating him differently. He points out that the tariff makes no distinction between a prospective customer who seeks water service for his own imminent consumption and a real estate developer who seeks a commitment to serve lots he intends to sell to others at some future time. He reasons that Wilkinson Water would collect the same amount in connection fees whether it were to collect them from Bradshaw for twenty-one lots collectively or from twenty-one individual lot owners.

¶ 16 We disagree. The primary basis for distinguishing between a real estate developer and an individual customer is found in the substantial risk to the utility and its customers presented by a developer's request for a commitment to serve a proposed subdivision when the utility's infrastructure is insufficient to meet the anticipated demand. In such a situation, the utility is asked to construct additional facilities without any assurances that the increased demand will soon materialize in the form of rate-paying customers.

¶ 17 Real estate development is a speculative enterprise. Indeed, Bradshaw previously delayed his development for a period of approximately five years after first approaching Wilkinson Water about a service commitment. Bradshaw's lots may or may not be developed and may or may not be sold. Even if they are sold, a great deal of time may elapse before the lots actually require water service. Wilkinson Water and its existing customers should not be forced to bear the costs of constructing additional facilities that may turn out to be unnecessary. As the Commission pointed out, this would be tantamount to forcing a utility's customers to speculate in real estate development.

¶ 18 Moreover, as the Commission noted in its decision, it is unlikely that simultaneous individual requests for new service would amount to such an increase in demand as to require the utility to construct additional facilities. There is a marked increase in the risk associated with the construction of a multi-unit housing development over the risk associated with construction of a single home. In contrast to a hypothetical simultaneous request for service from twenty-one lot owners, a developer's request for a service commitment does not necessarily represent twenty-one customers ready to move in and immediately begin paying for water service. Therefore, it may be years before Wilkinson Water can begin to recover the costs of its additional construction in the form of payments for service.

¶ 19 The Commission has adopted a policy recognizing that real estate developers are better positioned than local utilities to bear the costs associated with construction of additional infrastructure necessary to supply water to proposed subdivisions.[3] We find nothing in the Commission's policy to be unreasonably discriminatory or otherwise unlawful.

---

2. Section 54–3–8 of the Utah Code provides:
 No public utility shall, as to rates, charges, service, facilities or in any other respect, make or grant any preference or advantage to any person, or subject any person to any prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, charges, service or facilities, or in any other respect, either as between localities or as between classes of service.
 Utah Code Ann. § 54–3–8(1) (2003).

3. Bradshaw argues that the Commission's policy applies only in cases, unlike this one, where the developer owns the water system. The administrative law judge found this argument unpersuasive because the policy's purpose of shielding customers from exposure to the risks of real estate development is served in both situations. We agree with the administrative law judge and hold that application of the policy should not depend on whether Bradshaw owns the utility.

## B. The Tariff Need Not Be Strictly Construed Against Wilkinson Water

¶ 20 Bradshaw also argues that the Commission erred by not construing the tariff strictly against Wilkinson Water. In *Josephson*, we observed that because tariffs mainly serve the interests of the utility, a utility's tariff "should be construed strictly against [it]." 576 P.2d at 852.

¶ 21 While the observation enunciated in *Josephson* is applicable in most instances, it does not apply in this case. Construing a tariff against a utility generally protects the customers of the utility against unreasonable or unjustified charges. In this case, however, construing the tariff strictly against Wilkinson Water may actually harm its existing customers by requiring them, rather than Bradshaw, to bear the costs associated with service to Bradshaw's proposed development.

¶ 22 The Commission's requirement that Bradshaw be responsible for the costs of the infrastructure necessary to serve his proposed subdivision was motivated in part by a desire to protect consumers within the Wilkinson Water service area from the risk that the construction costs for new infrastructure may not otherwise be recovered. The Commission is not required to mechanically construe a tariff against a utility when the particular circumstances of an individual case dictate a contrary result.

¶ 23 We find that the Commission's interpretation of the tariff was reasonable in this case. We therefore affirm the Commission's holding that the tariff in question does not require Wilkinson Water to bear all of the costs associated with preparing to serve Bradshaw's proposed development. Rather, Bradshaw should bear a proportionate share of those costs.

## II. THE NEED FOR ADDITIONAL INFRASTRUCTURE

¶ 24 Bradshaw alternatively attacks the Commission's holding that he be required to bear a proportionate share of the costs asso-ciated with additional infrastructure by arguing that Wilkinson Water's existing plant is adequate to meet the anticipated needs of his proposed subdivision. Bradshaw reasons that he can be required to contribute to the costs of additional infrastructure only if the proposed subdivision will actually force Wilkinson Water to exceed its existing capacity.

¶ 25 Bradshaw argues that the Commission erred when it found that Wilkinson Water's source and storage capacity might be inadequate to meet the anticipated demands of the proposed subdivision. Specifically, Bradshaw argues that the Commission improperly departed from the source and storage requirements promulgated by the Utah Drinking Water Board (the "Drinking Water Board Standards")[4] in estimating the necessary capacity for the system. Bradshaw maintains that the Commission was bound to rely on the Drinking Water Board Standards by their terms and also because he and Wilkinson Water had so stipulated. Bradshaw also argues that the Commission's factual findings with respect to the likely need for increased capacity were not supported by substantial evidence.

### A. The Commission Was Not Bound by the Drinking Water Board Standards in Assessing the Anticipated Demands on Wilkinson Water's System

¶ 26 Whether the Commission was required to rely on the Drinking Water Board Standards in determining whether Wilkinson Water's existing facilities are adequate to supply Bradshaw's proposed subdivision presents a question of law that we review for correctness. *Savage Bros. v. Pub. Serv. Comm'n*, 723 P.2d 1085, 1087 (Utah 1986) ("Where the issue involves the interpretation of a general question of law, we apply a correction-of-error standard, with no deference to the expertise of the Commission." (internal quotation omitted)). We are unpersuaded by Bradshaw's argument that the Commission was legally bound to use the Drinking Water Board Standards to resolve the factual issues presented in this case. Neither Title 54 of the Utah Code nor the Drinking Water Board Standards themselves

4. *See* Utah Admin. Code R309–510 (2003).

require that the Commission rely on the Drinking Water Board Standards in estimating the need for utility plant expansion. Thus, while the Drinking Water Board Standards may have been informative, they were not binding.

¶ 27 Title 54 vests authority in the Commission to ensure that a public utility's charges are just and reasonable. By contrast, the Drinking Water Board Standards were promulgated for the purpose of the "sizing of public drinking water facilities such as sources (along with their associated treatment facilities), storage tanks, and pipelines." Utah Admin. Code R309–510–1 (2003). The Drinking Water Board Standards exist to guarantee an adequate supply of drinking water to a utility's customers. They were not intended to constrain the Commission in determining whether a utility's charges are just and reasonable under Title 54 of the Utah Code. While the Commission found them useful in estimating future demand on the Wilkinson Water system, the Commission did not err in refusing to treat them as determinative.

▮▮ ¶ 28 In the alternative, Bradshaw argues that the Commission was bound by the Drinking Water Board Standards because the parties so stipulated. This argument fails because the Commission cannot permit itself to be bound by stipulated standards when doing so would contravene its statutory mandate to consider the public interest.

¶ 29 Upon agreeing to reconsider Bradshaw's appeal, the Commission requested that the parties provide a list of agreed upon and disputed facts and issues. In response, Bradshaw and Wilkinson Water submitted a statement of "Stipulated Facts," which contained the agreement of the parties to use the Drinking Water Board Standards in estimating the water use and capacity that would

be required to serve Bradshaw's proposed subdivision.

¶ 30 At the hearing, the Commission did not limit Wilkinson Water's evidence of anticipated future requirements to the Drinking Water Board Standards and Bradshaw objected. The Commission ruled that it might "have to make resolutions beyond what [the parties] have stipulated to, as far as the issues to be resolved by the Commission."

¶ 31 In its order on reconsideration, the Commission indicated that it had not limited itself to the Drinking Water Board Standards in evaluating whether Wilkinson Water could meet the anticipated demand associated with Bradshaw's development. Although the Commission considered the Drinking Water Board Standards to be useful guidelines, it held that it was not strictly bound by the Standards in evaluating whether it was just and reasonable for Bradshaw to bear a proportionate share of the costs of constructing new facilities.

¶ 32 Whether the Commission was bound by the stipulation of the parties in this case is a question of law that we review for correctness. Utah Code section 63–46b–16(4)(h)(ii) authorizes the courts to grant relief to a petitioner if an agency decision is "contrary to a rule of the agency." Utah Code Ann. § 63–46b–16(4)(h)(ii) (1997). Bradshaw alleges that rule 746–100–10(F)(4) of the Utah Administrative Code required the Commission to treat the parties' stipulations as binding. He therefore concludes that the Commission's failure to strictly apply the Drinking Water Board Standards as stipulated by the parties renders the Commission's decision invalid.

▮▮▮ ¶ 33 We disagree and hold that the Commission did not err when it refused to abide by the stipulation. Ordinarily, stipulations are binding in the context of administrative proceedings.[5] *Yeargin v. State Tax*

---

5. Rule 746–100–10(F)(4) of the Utah Administrative Code provides that stipulations of the parties as to "relevant matters of fact" are binding on the participants:

Stipulations—Participants in a proceeding may stipulate to relevant matters of fact or the authenticity of relevant documents. Stipulations may be received in evidence, and if received, are binding on the participants with

respect to any matter stipulated. Stipulations may be written or made orally at the hearing. Utah Admin. Code R746–100–10(F)(4) (2003). We note that this rule is limited to stipulations of "relevant matters of fact or the authenticity of relevant documents" that are "received in evidence." It does not extend to stipulations that involve legal issues, such as whether the Com-

*Comm'n,* 2001 UT 11, ¶ 19, 20 P.3d 287. However, an administrative body may not apply its rules in a way that is inconsistent with statute. *See McKnight v. State Land Bd.,* 14 Utah 2d 238, 381 P.2d 726, 730 (1963) ("[T]he rules and regulations of an administrative agency must conform to rather than be contrary and inconsistent with statutory law."); *cf. First of Denver Mortgage Investors v. C.N. Zundel & Assocs.,* 600 P.2d 521, 527 (Utah 1979) (holding that stipulations are not binding "when points of law requiring judicial determination are involved"). The binding effect of parties' stipulations in hearings before the Commission must be relaxed where the Commission would act unlawfully in limiting itself to the stipulations. The principle that stipulations are binding must therefore yield to the Commission's statutory mandate to consider the interests of parties outside of the proceeding, such as a utility's customers and the public interest generally. *See* Utah Code Ann. §§ 54–3–1, 54–4–1 (2000).

¶ 34 The "Stipulated Facts" in question were agreements on the amount of water that would be required by Bradshaw's subdivision and on the method by which future outdoor water requirements would be estimated. The stipulations therefore constituted a limitation on the Commission's ability to meet its statutory mandate of considering the public interest. Had the Commission limited itself to these stipulated standards, it would have ruled out any other type of evidence tending to show that Wilkinson Water likely would need to construct additional facilities to meet future demand, or evidence to the contrary. To rule out such evidence would have been to turn a blind eye to the interests of parties outside the proceeding, such as current and future customers of Wilkinson Water.

¶ 35 The stipulated standards also would have intruded on the mandate in section 54–4–18 of the Utah Code that the Commission "fix adequate and serviceable standards for the measurement of quantity, quality, pressure, initial voltage or other conditions pertaining to the supply of the product, commodity or service furnished or rendered by

any such public utility." *Id.* § 54–4–18 (2000). Had the Commission permitted the parties to dictate the standards for estimating future water demand, it would have impermissibly delegated to the parties the task of determining standards of measurement for the supply of water to the public in Morgan County.

¶ 36 Unlike traditional court proceedings, hearings before the Commission are not designed to consider only the interests of the litigating parties. The Commission must consider the interests of the utility's customers and the interests of the public. *See id.* §§ 54–3–1, 54–4–1; *Stewart v. Pub. Serv. Comm'n,* 885 P.2d 759, 776 (Utah 1994) (holding that the role of the Commission is to accommodate the interests of a utility's ratepayers and shareholders to the overall public interest); *cf. Comm. of Consumer Servs. v. Pub. Serv. Comm'n,* 2003 UT 29, ¶ 15, 75 P.3d 481 (holding that the Public Service Commission must review a utility's affiliate transaction for prudence, as part of the Commission's responsibility to determine that a rate increase is just and reasonable, before it may accept a stipulation leading to a rate increase). Accordingly, the Commission cannot be bound by stipulated standards in contravention of its statutory mandate to serve the public interest.

*B. Substantial Evidence Supports the Commission's Determination That Bradshaw Must Bear a Proportionate Share of the Cost of New Facilities Required to Serve His Proposed Development*

¶ 37 Bradshaw challenges the Commission's conclusion that Wilkinson Water's existing facilities may be insufficient to supply Bradshaw's proposed subdivision. We will affirm the Commission's factual findings unless they are "not supported by substantial evidence when viewed in light of the whole record before the court." Utah Code Ann. § 63–46b–16(4)(g) (1999). We have interpreted this "substantial evidence" standard to mean "that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion."

mission must use certain measuring standards in regulating the charges of public utilities.

*Bradley v. Payson City Corp.*, 2003 UT 16, ¶ 15, 70 P.3d 47 (quotation and citation omitted).

¶ 38 Before addressing Bradshaw's specific arguments, we note that his general approach to this issue is inconsistent with the fundamental premise of the Commission's ruling. Indeed, the Commission explicitly stated that its ruling in this matter did not turn on its resolution of the competing calculations of plant capacity requirements offered by the parties.

¶ 39 The administrative law judge found that Wilkinson Water's system was operating "at or near capacity for both source and storage resources," measured "according to Utah Division of Drinking Water [S]tandards." Based in part on this finding, he found no violation of the Wilkinson Water tariff, or of any applicable law or rule, in Wilkinson Water's requirement that Bradshaw bear some of the cost of constructing additional facilities.

¶ 40 On reconsideration, the Commission declined to render any specific factual findings regarding the adequacy of Wilkinson Water's existing infrastructure and the amount of additional infrastructure that would be required to serve Bradshaw's proposed subdivision. Rather, the Commission held that evidence regarding the adequacy of Wilkinson Water's existing plant was not dispositive. It stated:

> Mr. Bradshaw will be required to pay for the proportionate share of water plant costs that are reasonably attributable to provide water service to his proposed subdivision. . . . *We recognize that utility plant development is not necessarily sized, engineered or built to provide service solely to one development. Deployment of utility plant takes into consideration the current and future uses of existing customers, potential customers that might locate in the proposed subdivision and potential customers that may locate elsewhere in the utility's service territory. As long as the overall deployment of additional water plant is reasonable in relation to the Company's reasonable operations, Mr. Bradshaw*

> *should provide for the recovery of a proportionate amount of the costs.*

(Emphasis added.)

¶ 41 While the Commission recognized that it would have been helpful to the parties to provide specific guidance with respect to the level of reasonable plant deployment in this particular case, it determined that the record did not provide support for any detailed instructions. Accordingly, it ruled that "to the extent the parties are unable to reach mutually acceptable resolution of future issues, further proceedings may be conducted by the Commission."

 ¶ 42 In contrast, Bradshaw's approach to the determination of plant capacity seems to proceed from the assumption that he will not be required to pay anything beyond connection fees if he can show that anticipated demand from his subdivision will not exhaust every remaining drop of Wilkinson Water's source and storage capacity. This assumption is wrong. The Commission did not hold that Bradshaw's obligation to bear a proportionate share of construction costs was contingent upon proof that Wilkinson Water's existing source and storage capacity could not possibly absorb the demands of Bradshaw's subdivision. Rather, the Commission upheld the administrative law judge's finding that Wilkinson Water's system was operating "at or near capacity" and that some expansion of Wilkinson Water's facilities was "reasonably necessary" to meet the anticipated demand of Bradshaw's subdivision. We therefore will affirm the Commission's holding so long as we are able to find substantial evidence suggesting that the anticipated demands of Bradshaw's proposed subdivision *may* exceed existing plant capacity. We first discuss the dispute over storage capacity, and then the issue of source capacity.

¶ 43 The most significant dispute, measured in terms of water volume, related to the question of storage capacity is whether the Commission should have considered the storage capacity owned by the Wilkinson family as part of Wilkinson Water's storage capacity. The Wilkinson Water storage tanks have a capacity to store 400,000 gallons of water, but 146,000 gallons of that storage

capacity are owned by the Wilkinson family (the "family capacity"). That leaves 254,000 gallons of capacity owned by Wilkinson Water.

¶ 44 In the past, the family capacity has readily been made available to the utility to meet peak demand. In such cases, the family capacity apparently has been transferred to the utility without consideration. There is, however, no agreement obligating the Wilkinson family to make its storage capacity available to the company in the future. Because Wilkinson Water owns only 254,000 gallons of capacity, and has no contractual right to use the family capacity, the Commission's use of this figure is supported by substantial evidence.[6] We therefore affirm the Commission's finding with respect to the current storage capacity available to Wilkinson Water.[7]

¶ 45 Bradshaw also challenges the fire flow storage requirement applied by the Commission, arguing that it should have found the requirement to be 60,000 gallons rather than 120,000 gallons. Mr. Wilkinson testified at the first hearing that Wilkinson Water was required to have 60,000 gallons of storage at all times for fire flow. At the hearing on reconsideration, however, the Commission heard evidence that the State Fire Marshal had increased the fire flow requirement, and that the Water Quality Board had set a standard of 120,000 gallons of storage in cases where no local fire suppression authority exists. It also heard evidence that the local fire suppression authority, the Fire Marshal for Morgan, requires a fire flow capacity of 180,000 gallons. We find that this constitutes substantial evidence supporting the Commission's determination that the required fire flow storage was at least 120,000 gallons.

¶ 46 The resulting calculations show that the anticipated additional storage capacity required by Bradshaw's development would substantially exceed the 254,000 gallon storage capacity owned by Wilkinson Water. We therefore affirm the Commission's finding that the anticipated additional storage demands associated with Bradshaw's proposed development may require the construction of additional facilities.

¶ 47 Finally, we turn to Bradshaw's argument that Wilkinson Water has sufficient source capacity to meet the anticipated needs of Bradshaw's development. As presented to the Commission, the dispute on source capacity consisted of disagreement over the percentage of land in each lot that should be considered irrigable, as well as disagreement over the sizes of the lots currently served by Wilkinson Water.

¶ 48 The Commission made no specific findings as to these factual disputes. After noting the parties' disagreement over these issues, the Commission held:

> Although the Commission believes that consideration of well production capacity has relevance in this matter, it does not believe that the absolute numbers resulting from the competing calculations should be directly applied in the fashion advocated by the parties. Whether the Company's wells appear to have production capacity that falls short of or exceeds the gallons per minute recommendations of the Division of Drinking Water, is not singularly dispositive of determining the conditions by which Wilkinson Water would prepare to serve possible, future customers in Mr. Bradshaw's proposed development.

6. By affirming this finding, we do not mean to suggest that the Commission may permit parties within its jurisdiction to manipulate its decisions through the use of affiliate transactions that shift the ownership of assets. In this case, there was no evidence that the sale of capacity from Wilkinson Water to the Wilkinson family was undertaken for the purpose of shifting or sharing future expansion costs with a real estate developer or some other third party. Rather, the evidence suggested the transaction was motivated by the legitimate objective of reducing the company's debt.

7. Our affirmance of the Commission's use of 254,000 gallons as the amount of water storage capacity owned by Wilkinson Water is limited to the purposes for which the Commission used it, that is, in determining whether there was a reasonable likelihood that Wilkinson Water would need to expand its facilities to meet Bradshaw's demand. We express no opinion on what figures or methods should be used in determining what proportion of the plant expansion costs are properly attributable to Bradshaw.

The Commission's refusal to resolve the competing calculations of source capacity was further based on its observation that "[t]he record also reflects that calculations of water needs based upon Division of Drinking Water recommendations and assumed water consumption does not mirror actual use for individual consumers." In short, the Commission made no finding resolving the dispute over source capacity and therefore did not rely on any such finding in deciding that Bradshaw must pay for a proportionate share of expansion costs that are "reasonably necessary" to meet the needs of Bradshaw's proposed development.

¶ 49 Because the Commission did not rule on the question of Wilkinson Water's source capacity, it would be inappropriate for us to resolve it on appeal. The proportion of the costs of additional source capacity, if any, for which Bradshaw will be obligated is therefore left to resolution by the parties or, failing that, to resolution by the Commission in subsequent proceedings.

## CONCLUSION

¶ 50 We affirm the Public Service Commission's order requiring Bradshaw to bear "a proportionate share of the reasonable costs of reasonably necessary water plant installed or required to provide utility service to Bradshaw's proposed development." To the extent that the parties are unable to agree on what constitutes a proportionate share of reasonably necessary costs, that issue must be resolved, in the first instance, by the Commission.

¶ 51 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice NEHRING concur in Justice PARRISH's opinion.