*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 45**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

ALPINE HOMES, INC.,[1]
*Appellees,*
*v.*
CITY OF WEST JORDAN,
*Appellant.*

No. 20140010
Filed August 10, 2017

On Appeal of Interlocutory Order

Third District, West Jordan
The Honorable Barry G. Lawrence
No. 20140010

Attorneys:

Bruce R. Baird, P. Matthew Muir,
Salt Lake City, for appellees

JeffreyRobinson, Robert Thorup, Stuart E. Williams,
Paul D. Dodd, West Jordan City, for appellant

JUSTICE DURHAM authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUDGE CONNORS joined.

Having recused himself, JUSTICE PEARCE does not participate herein;
DISTRICT COURT JUDGE DAVID M. CONNORS sat.

JUSTICE DURHAM, opinion of the Court:

## INTRODUCTION

---

[1] BUILDING DYNAMICS, INC., D.R. HORTON, INC., HAMLET HOMES CORP., HOLMES HOMES, INC., HOME CENTER CONSTRUCTION CO., IVORY HOMES, LTD., LEON PETERSON DEVELOPMENT CO., LIBERTY HOMES, INC., MCARTHUR HOMES, INC., RELIANCE HOMES, INC., RICHMOND AMERICAN HOMES OF UTAH, INC., and WESTVIEW HOMES, LLC are also parties to this appeal.

¶1    In this case, several property developers allege that the City of West Jordan violated statutory provisions that regulate how a municipality may spend the impact fees collected from developers. They claim that the city violated statutes requiring it to spend the fees on specified categories of expenditures within six years. The developers' first claim for relief in the operative complaint is for a declaratory judgment. The district court dismissed only the last portion of that claim, which sought a declaratory judgment that West Jordan must refund all or part of the impact fees to them. Neither party addresses this claim on appeal, so we make no ruling as to the declaratory judgment action. Nor does either party argue against the district court's dismissal of the developers' sixth claim, the request for attorney fees as a separate claim for relief. The developers' second through fifth claims for relief seek a refund of the allegedly misspent or unspent impact fees either because of an unconstitutional taking or as a claim in equity.

¶2    Our threshold concern is whether the developers have standing to bring their claims. Standing is a question of subject matter jurisdiction that "raise[s] fundamental questions regarding a court's basic authority over the dispute." *Brown v. Div. of Water Rights of Dep't of Nat. Res.*, 2010 UT 14, ¶ 13, 228 P.3d 747. This issue can be raised *sua sponte* by the court. S*ee State v. Tuttle*, 780 P.2d 1203, 1207 (Utah 1989). "[T]he issue of subject matter jurisdiction is a threshold issue, which can be raised at any time and must be addressed before [turning to] the merits of other claims." *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 10, 342 P.3d 224 (alterations in original) (citation omitted). Only if the developers have standing do we turn to whether any of their claims survive a motion to dismiss based on the merits.

¶3    The developers have standing to challenge the constitutionality of the impact fees they were assessed. But the time to challenge the relationship between the government's demand for property and the anticipated social costs of a proposed land use is at the time the impact fees are exacted and is limited by statute to "one year after the day on which the person or entity pays the impact fee." UTAH CODE § 11-36a-702(1)(c). The developers' argument that their claims against West Jordan for either allegedly failing to spend impact fees within six years or spending the fees on impermissible expenditures were not ripe until the six-year period elapsed is inadequate to support a constitutional takings claim. The manner in which a city spends impact fees does not affect the constitutionality of the initial demand for fees. *See Koontz v. St. Johns River Water Mgmt Dist.*, 133 S. Ct. 2586 (2013). We hold that the developers have failed to state a takings claim for which relief can be granted.

2

¶4 To the extent that the developers are seeking a remedy of a refund of fees in equity for the asserted injury of illegally misspent or unspent fees, they do not have standing. The city was authorized by the Impact Fees Act to assess impact fees to offset the expected costs of development in certain areas. *See* UTAH CODE §§ 11-36a-101 to -705. There is no injury to the developers by the authorized assessment of impact fees that survive a takings challenge. We hold that where the developers cannot establish an unconstitutional demand for authorized impact fees at the time they were exacted, they do not have standing to bring claims against West Jordan. As a result, the courts do not have subject matter jurisdiction to hear a claim in equity about whether the fees were misspent or unspent in this case.

¶5 Because the developers have failed to state a takings claim for which relief can be granted, and because they do not have standing to bring a claim in equity, we reverse the district court's denial of the motion to dismiss.

## BACKGROUND

¶6 West Jordan, like many municipalities, requires developers to pay impact fees before the city approves a development project. These impact fees are designed to defray the anticipated increase in city expenditures caused by the proposed development. The impact fees collected by West Jordan include fees associated with the increased need for park services, roads, police protection, water services, storm water infrastructure, and sewer services. The legislature has enacted the Impact Fees Act, which regulates the manner in which cities and other political subdivisions may asses and spend impact fees. UTAH CODE §§ 11-36a-101 to -705.

¶7 In 2012, thirteen developers that had paid impact fees to West Jordan between 2003 and 2006 filed this action. The operative complaint claimed that the developers were entitled to a refund of all or some of these fees under two broad theories. The developers claimed that West Jordan violated the Impact Fees Act by failing to spend or encumber all of the impact fees within six years, *see id.* § 11-36a-602(2)(a), and by spending portions of the impact fees on impermissible uses, *see id.* § 11-36a-602(1).[2] The developers argued

---

[2] In determining whether a lawsuit survives a motion to dismiss, "we assume that the factual allegations in the complaint are true and we draw all reasonable inferences in the light most favorable to the plaintiff." *Berneau v. Martino*, 2009 UT 87, ¶ 3, 223 P.3d 1128 (citation omitted).

that these violations constituted "a taking of private property for public use without just compensation in violation of Article 1 Section 22 of the Utah Constitution and the Fifth and Fourteenth Amendments to the U.S. Constitution." The developers also asserted an "equitable" right to reimbursement because West Jordan had failed to comply with two provisions of the Impact Fees Act.

¶8    West Jordan filed a motion to dismiss these claims. It argued that any failure to spend the impact fees in the manner prescribed by the Act was not an unconstitutional taking of the developer's private property. West Jordan also argued that the Impact Fees Act did not give the developers a private refund remedy for any failure to comply with provisions regulating its use of the impact fees, and that the developers had no equitable right to a refund.

¶9    The district court denied West Jordan's motion to dismiss the developers' constitutional and equitable claims. This court subsequently granted West Jordan's petition to file an interlocutory appeal from the district court's order denying dismissal of these claims. After hearing initial oral arguments on this case in October 2015, we remanded to the district court for the limited purpose of determining if any of the developers owned any of the property at issue in this action. The district court found that they had no remaining ownership interest in the properties in question. We then requested supplemental briefing on the question of the developers' standing to bring this claim, and provided each party the opportunity to present their cases at oral arguments in November 2016.

**STANDARD OF REVIEW**

¶10 Our standard of review for standing is "generally . . . considered a 'mixed question' because it involves the application of a legal standard to a particularized set of facts." *Utah Chapter of the Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 13, 148 P.3d 960. But "the question of whether a given individual or association has standing to request a particular relief is primarily a question of law." *Kearns-Tribune Corp. v. Wilkinson*, 946 P.2d 372, 373 (Utah 1997). We review the "factual determinations made by a trial court with deference." *Id.* at 373–74. However, we afford "minimal discretion to the trial court" on a "determination[] of whether a given set of facts fits the legal requirements for standing." *Id.* at 374.

¶11 We review the district court's decision to dismiss de novo. *See Turner v. Staker & Parson Cos.*, 2012 UT 30, ¶ 7, 284 P.3d 600 ("A ruling on a motion to dismiss presents a legal question that we

review for correctness, affording no deference to the district court's decision.").

## ANALYSIS

¶12 The standing of the developers to bring the claims raised in this case is a threshold question. We address separately the standing for the takings claims and the claims for equitable relief. As to the takings claims, we conclude that the developers do have constitutional and statutory standing to bring claims for a taking, and therefore we assess this claim on its merits. We ultimately conclude that the takings claims were not filed timely and are no longer available as a remedy. We thus reverse the ruling of the district court and direct dismissal of the takings claims.

¶13 Regarding the claims for relief based in equity, we conclude that there is no statutorily granted standing, so the developers must establish standing according to Utah case law. Because a refund of the impact fees the developers incurred will not redress the parties that would actually be injured by the city's alleged misspent or unspent impact fees, the developers fail to establish standing for these claims. We therefore will not address this issue on the merits. Again, we reverse the district court and direct dismissal of the claims in equity.

## I. THE TAKINGS CLAIMS

¶14 The developers had a statutorily granted "standing to file a declaratory judgment action challenging the validity of an impact fee." UTAH CODE § 11-36a-701(1). However, this right is "[s]ubject to the time limitations described in Section 11-36a-702 and procedures set forth in Section 11-36a-703." *Id.* § 11-36a-701(3)(a). Section 11-36a-702(1)(c) limits actions brought challenging the validity of an impact fee to "one year after the day on which the person or entity pays the impact fee." Had the developers brought a challenge to the impact fee within this time frame, they would be able to seek "a refund of the difference between what the [developers] paid as an impact fee and the amount the impact fee should have been if it had been correctly calculated." *Id.* § 11-36a-701(3)(c). The developers did not challenge the impact fee within this period, and therefore their standing to file this action under Utah Code section 11-36a-701 is barred.

¶15 The developers also argue that their "constitutional rights . . . have been violated by the City's unlawful expenditure and retention of impact fees" under the takings clauses of the Utah and U.S. constitutions, and that this cause of action was not ripe until the six years allowed by statute for the city to spend or encumber the

fees had passed. *See id.* § 11-36a-602. They make two basic arguments under the federal takings clause. First, they assert that any violation of the Impact Fees Act on the part of West Jordan also constitutes a per se violation of the takings clause. Second, they argue that the city's failure to spend all of the impact fees on statutorily mandated expenditures within six years violates the unconstitutional conditions doctrine applied in *Koontz v. St. Johns River Water Management District*, 133 S. Ct. 2586 (2013). Both of these arguments fail.

### A. The Utah Constitution's Takings Clause

¶16 Both the U.S. Constitution and the Utah Constitution protect private property against uncompensated governmental takings. U.S. CONST. AMEND. V ("[P]rivate property [shall not] be taken for public use, without just compensation."); UTAH CONST. art. I, § 22 ("Private property shall not be taken or damaged for public use without just compensation."). Although the Utah clause is similar to the federal clause, "we do not presume that federal court interpretations of federal Constitutional provisions control the meaning of identical provisions in the Utah Constitution." *State v. Briggs,* 2008 UT 83, ¶ 24, 199 P.3d 935. Indeed, we have noted that the Utah Constitution extends protection above that of the U.S. Constitution for *damage* to private property. S*ee* UTAH CONST. art. I, § 22; *Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶ 20, 275 P.3d 208. Thus, the "state constitutional provision [is] broader than its federal counterpart." *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 13, 235 P.3d 730.

¶17 But this court generally does not engage in a state constitutional analysis absent adequate briefing. "[C]ursory references to the state constitution within arguments otherwise dedicated to a federal constitutional claim are inadequate" to raise a state constitutional issue. *State v. Worwood*, 2007 UT 47, ¶ 18, 164 P.3d 397. The developers cite the takings clause of the Utah Constitution in their briefing, but they do not undertake an independent analysis of the language of the Utah provision, cite authority interpreting it, or otherwise present an independent rationale for a takings violation as a matter of state law. *See id.* (listing several methods of adequately briefing a state constitutional argument). Absent such briefing, we decline to conduct an independent analysis of the Utah takings clause.

### B. The U.S. Constitution's Takings Clause

¶18 The takings clause of the U.S. Constitution is applied against the States through the Fourteenth Amendment. There are two broad

categories of takings under Supreme Court jurisprudence: physical takings and regulatory takings.[3] *See B.A.M. Dev., L.L.C. v. Salt Lake Cty (B.A.M. I)*, 2006 UT 2, ¶¶ 32–33, 128 P.3d 1161. Each category uses a different analysis for determining whether a government action rises to the level of a taking requiring just compensation. Physical takings are per se takings and must be compensated no matter how minimal the impact on the property owner. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35 (1982). "A taking's a taking no matter how small." E. Brigham Daniels (*citing* DR. SUESS, HORTON HEARS A WHO! (1954)). On the other hand, "regulatory takings do not always trigger an obligation to compensate the property owner." *B.A.M. I*, 2006 UT 2, ¶ 33. If a regulation is "so onerous that its effect is tantamount to a direct appropriation or ouster . . . [it] may be compensable." *Lingle v. Chevron U.S.A., Inc.* 544 U.S. 528, 537 (2005). Regulatory takings are evaluated by "engaging in essentially ad hoc, factual inquiries" with reference to "several factors—such as economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *B.A.M. I*, 2006 UT 2, ¶ 33 (quoting *MacDonald, Sommer & Frates v. Yolo Cty.*, 477 U.S. 340, 349 (1986)).

¶19 Development exactions share characteristics of both physical and regulatory takings. "Exactions are conditions imposed by governmental entities on developers for the issuance of a building permit or subdivision plat approval." *B.A.M. I*, 2006 UT 2, ¶ 34. These exactions can be in the form of mandatory land dedications or monetary obligations. Whether an exaction is unconstitutional depends on if it "has inherited more features from its physical or regulatory takings progenitor." *Id.* ¶ 35.

¶20 The U.S. Supreme Court has held that development exactions must have an "essential nexus" with "rough proportionality" to the public burdens that the development will impose on government. In *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994), the Supreme Court examined situations where the government

---

[3] "As its name implies, a physical taking occurs when a governmental entity physically invades or occupies private property as a result of which the property is made available for use by others." *B.A.M. Dev., L.L.C. v. Salt Lake Cty. (B.A.M. I)*, 2006 UT 2, ¶ 32, 128 P.3d 1161. "Regulatory takings, by contrast, occur when a governmental entity intrudes to limit the use of private property while not physically seizing it." *Id.* ¶ 33.

conditioned the approval of a permit to develop property on the property owner's uncompensated transfer of a real property right to the government. *Nollan*, 483 U.S. at 828 (development rights conditioned upon grant of a public easement along a beach); *Dolan*, 512 U.S. at 379–80 (development rights conditioned upon dedications of land for storm drainage and a pedestrian/bicycle pathway). The government gave the property owners a choice: either waive their constitutional right to just compensation for the taking of real property rights or have their land-use permit denied. *Nollan* and *Dolan* held that placing such a condition on the grant of a land-use permit violates the takings clause unless the government can show both an "essential nexus" and "rough proportionality" between the social costs of the proposed development and the real property interest exacted by the government to ameliorate those social costs. *Dolan*, 512 U.S. at 386, 391.

¶21 Until relatively recently, the Supreme Court applied this essential nexus and rough proportionality test only where the government demanded a real property right in exchange for a land-use permit. But in *Koontz*, the Court examined a fact pattern in which the government essentially demanded money in exchange for a land-use permit. 133 S. Ct. at 2593. In that case, a government agency conditioned a permit to develop a parcel of property containing wetlands upon the landowner's agreement to fund conservation projects on separate, government-owned wetlands. *Id.* The landowner refused to comply with this condition and sued the government agency, arguing that the *Nollan-Dolan* test should be applied to determine the constitutionality of a monetary exaction for a land-use permit. *Id.*

¶22 In evaluating the landowner's claim, the Court first emphasized that the *Nollan-Dolan* line of cases is based upon the "unconstitutional conditions doctrine." *Id.* at 2594. This doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Id.* It permits challenges under the takings clause even where the government has not seized private property, but instead has conditioned a government benefit upon acquiescence to an uncompensated taking of private property.

> Extortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation. As in other unconstitutional conditions cases in which someone

refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury.

*Id.* at 2596. Thus, it is the constitutionality of the government-imposed condition that is at issue under a *Nollan-Dolan* claim, not a consummated taking of private property that triggers a categorical right to compensation.

¶23 The Court then examined whether the *Nollan-Dolan* test must be applied when the government requires a property owner to spend money as a precondition to the approval of a land-use permit. *Id.* at 2598–2602. In so doing, the Court had to decide how the unconstitutional conditions doctrine in the *Nollan-Dolan* line of cases intersects with the holding of *Eastern Enterprises v. Apfel*, 524 U.S. 498, 540 (1998), that the imposition of a general obligation to pay money does not trigger the just compensation requirement of the takings clause.[4]

¶24 Distinguishing *Eastern Enterprises*, the *Koontz* Court held "that so-called 'monetary exactions' must satisfy the nexus and rough proportionality requirements of *Nollan* and *Dolan*." *Id.* at 2599. The Court expressed concern that if the *Nollan-Dolan* test did not apply to monetary exactions, "it would be very easy for land-use permitting officials to evade the limitations of *Nollan* and *Dolan*." *Id.* The Court further reasoned that the holding of *Eastern Enterprises* did not apply in the specific context of land-use exactions because where the government conditions a development permit upon the payment of money, there is a "direct link between the government's demand and a specific parcel of real property." *Id.* at 2600. Thus, a demand for money in exchange for a land-use permit is an unconstitutional condition under the takings clause unless the government can show an essential nexus and rough proportionality between the amount of money requested and the social costs of the proposed development.

---

[4] Although cash is personal property, a majority of the U.S. Supreme Court held in *Eastern Enterprises* that the government may impose a financial obligation without triggering the takings clause's just compensation requirement. 524 U.S. at 540 (Kennedy, J., concurring in judgment and dissenting in part); *id.* at 554–55 (Breyer, J., dissenting opinion joined by three other justices).

*C. The Developers' Taking Clause Claims*

¶25 The developers first assert that "the Impact Fees Act establishes rules governing the City's charging, collection, use and retention of impact fees which ensure that those activities remain consistent with Constitutional 'takings' requirements." From this premise, the developers argue that any violation of the Act also violates the U.S. Constitution. But this attempt to constitutionalize all the provisions of the Impact Fees Act fails. Even if we were to accept the developers' dubious assertion that the only purpose of each of the provisions of the Act is to codify the essential protections guaranteed by the takings clause, the Utah Legislature does not establish the bounds of the protections afforded by the U.S. Constitution. It is the duty of the judicial branch of government to interpret the Constitution. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178–80 (1803). A constitutional claim must be evaluated through an analysis of the text of the relevant provision along with binding case law interpreting the provision. We therefore reject the developers' argument that a violation of the Impact Fees Act is a per se violation of the takings clause. *See Tooele Assocs. Ltd. P'ship v. Tooele City Corp.*, 2011 UT 04, ¶ 28, 247 P.3d 371 ("Whether the City is in violation of the [Uniform Fiscal Procedures] Act has no bearing on whether the City's . . . fee is constitutional.").

¶26 Next, the developers argue that because West Jordan allegedly failed to spend some of the impact fees it collected within six years and spent some of the fees on statutorily prohibited expenditures, the city violated their rights under the takings clause. Notably, the developers make no claim—either below or to this court—that West Jordan's demands for impact fees constituted unconstitutional conditions at the time the demands were made because the fee lacked either an essential nexus or rough proportionality to the anticipated social costs of the proposed development. Rather, the developers argue that the manner in which the city later spent the impact fees ran afoul of *Koontz* and the *Nollan-Dolan* analysis.

¶27 We conclude that none of West Jordan's alleged violations of the Impact Fees Act implicate the unconstitutional conditions doctrine described in the *Nollan-Dolan* line of cases. *Nollan, Dolan*, and their progeny do not directly enforce the just compensation requirement for a consummated taking of private property. Rather, this line of cases evaluates the constitutionality of conditioning the grant of a land-use permit upon a landowner's uncompensated transfer of private property to the government. *Koontz*, 133 S. Ct. at 2594–95. Thus, it is the government's demand for property—

whether it be real property rights or an obligation to spend money—in exchange for the permit that is subject to evaluation under the *Nollan-Dolan* test. The proper analysis is whether there is a nexus and rough proportionality between the property demanded and the projected social costs of the proposed development. *Id.* at 2595 ("*Nollan* and *Dolan* . . . allow[] the government to condition approval of a permit on the dedication of property to the public so long as there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the applicant's proposal." (citations omitted)); *Dolan*, 512 U.S. at 388 ("The second part of our analysis requires us to determine whether the degree of the exactions demanded by the city's permit conditions bears the required relationship to the projected impact of petitioner's proposed development.").

¶28 In the context of a city's demand for impact fees in exchange for a land-use permit, the applicant may challenge the fee by asserting that it lacks either an essential nexus or rough proportionality to the anticipated external impacts of the proposed development. *See Koontz*, 133 S. Ct. at 2595, 2603. The key inquiry is whether the condition imposed by the government is constitutional. The demand for property is either permissible or forbidden under the takings clause at the time the demand is made based upon an evaluation of the "projected impact of [the] proposed development." *Dolan*, 512 U.S. at 388; *see Koontz*, 133 S. Ct. 2586.

¶29 The developers' allegations here that West Jordan either failed to spend impact fees within six years or spent the fees on impermissible expenditures are inadequate to support a takings claim. It does not matter that these claims would not be ripe until the six-year period for spending them elapsed. The manner in which a city spends impact fees does not affect the constitutionality of the initial demand for fees, which is the focus of the *Koontz* monetary exactions analysis. That the fees were not spent within six years does not affect the analysis of whether there was a nexus or whether the impact fees were roughly proportional at the time they were exacted. The developers may not expect to be the beneficiaries of any unspent funds after six years, just as the city cannot retroactively demand payment from the developers for expenditures that exceed the impact fees revenue for necessary improvements. The developers have not cited any cases that have applied a *Nollan-Dolan* analysis to a municipality's expenditure of impact fees. And because this analysis examines the relationship between the government's demand for property and the anticipated social costs of a proposed land use, there is no logical basis for this court to expand the application of the *Nollan-Dolan* test to a time

frame other than when the impact fees were exacted. Thus the developers have failed to state a takings claim for which relief can be granted.

## II. THE EQUITY CLAIMS

¶30  Absent statutorily granted standing, a party must establish standing as defined by Utah case law to bring an action in Utah courts. As both *Jenkins v. Swan*, 675 P.2d 1145 (Utah 1983), and *Utah Chapter of the Sierra Club v. Utah Air Quality Board*, 2006 UT 74, 148 P.3d 960, have made clear, the standing requirement in Utah is a protection of separation of powers that prevents the judiciary from "entertain[ing] generalized grievances that are more appropriately directed to the legislative and executive branches of the state government," *Jenkins*, 675 P.2d at 1149. *See Id.* at 1148–50; *Sierra Club*, 2006 UT 74, ¶¶ 11–12, 17.

> Inherent in the tripartite allocation of governmental powers is the historical and pragmatic conviction that particular disputes are most amenable to resolution in particular forums. The requirement that a plaintiff have a personal stake in the outcome of a dispute is intended to confine the courts to a role consistent with the separation of powers, and to limit the jurisdiction of the courts to those disputes which are most efficiently and effectively resolved through the judicial process.

*Jenkins*, 675 P.2d at 1149. The judicial branch uses the standing doctrine to ensure that "[a]n overstepping of appropriate restraints on judicial review" does not occur. *Id.* at 1150.

### A. Standing and the Equity Claims

¶31 Developers have no statutorily granted right to an "equitable" reimbursement in this case and must therefore satisfy the common law requirements for standing. "At the pleading stage of litigation, plaintiffs may satisfy our standing requirements . . . so long as the complaint contains adequate factual context to satisfy our notice pleading requirements." *Brown v. Div. of Water Rights of Dep't of Nat. Res.*, 2010 UT 14, ¶ 21, 228 P.3d 747. The notice pleading requirement is governed by rule 8 of the Utah Rules of Civil Procedure, which requires a claim to "contain a short and plain . . . statement of the claim showing that the party is entitled to relief."[5] UTAH R. CIV. P. 8(a). Further, rule 17 of the Utah Rules of

---

[5] "An original claim, counterclaim, cross-claim or third-party claim must contain a short and plain: (1) statement of the claim

(continued . . .)

Civil Procedure requires that "[e]very action . . . be prosecuted in the name of the real party in interest." UTAH R. CIV. P. 17(a). Pursuant to these rules and our case law, plaintiffs can establish standing by showing either through the traditional test, or, failing that, through the alternative test, that they are a real party in interest who is entitled to relief. *See Brown*, 2010 UT 14, ¶ 21; *Utah Chapter of the Sierra Club*, 2006 UT 74, ¶ 18.

¶32 Because an ability to prove standing may depend on facts that get explored during the discovery process, we do not hold plaintiffs to a high standard of proof to meet the standing requirement at the early stages of litigation. Here, the issue of standing is being reviewed in an appeal from a motion to dismiss brought prior to discovery. Accordingly, the developers' standing will be considered as though all allegations in their complaint, and all reasonable inferences drawn from those allegations, are taken as true.

¶33 In this case, even assuming all allegations in the developers' complaint and reasonable inferences drawn from them are true, there is still an insufficient factual basis in the record to show that the developers have standing for a claim in equity. There is no showing that the developers have sustained an injury that has a direct effect on them or that is suitably resolved by the courts. They have failed to establish standing through the traditional standing test. As the developers have not argued alternative standing, we do not address it in this opinion.

1. Traditional Standing

¶34 The traditional test, sometimes called the "distinct and palpable injury" requirement, assesses whether a "party has 'a real and personal interest in the dispute.'" *Utah Chapter of the Sierra Club*, 2006 UT 74, ¶¶ 19–20 (citation omitted). To show standing, a "party must allege that it has suffered or will 'suffer[ ] some distinct and palpable injury that gives [it] a personal stake in the outcome of the legal dispute.'" *Id.* ¶¶ 19 (alterations in original) (citation omitted). This test involves a three-step inquiry to determine whether a distinct and palpable injury exists:

---

(continued. . .)

showing that the party is entitled to relief; and (2) demand for judgment for specified relief." UTAH R. CIV. P. 8(a).

(1) "the party must assert that it has been or will be 'adversely affected by the [challenged] actions'";

(2) "the party must allege a causal relationship 'between the injury to the party, the [challenged] actions and the relief requested'"; and

(3) "the relief requested must be 'substantially likely to redress the injury claimed.'"

*Id.* (alterations in original) (citations omitted). This inquiry is conjunctive. In other words, each step must be demonstrated in order to confirm standing. A party must "satisf[y] all three . . . criteria" *id.* ¶ 20 to establish that it "ha[s] the incentive to 'fully develop[ ] all the material factual and legal issues in an effort to convince the court that the relief requested will redress the claimed injury.'" *Id.* ¶ 20 (second alteration in original) (citation omitted).

¶35 The developers have identified two theories under which they might have suffered a legal injury: (1) they could have retained contractual rights with the home purchasers to a refund of the impact fees if found excessive or (2) the purchase prices of the homes they sold did not compensate them for the impact fee.

¶36 The developers have suggested that they could have entered into a contractual agreement with the lot purchasers wherein they retained the rights to a refund of impact fees should there be such a refund. Even assuming that a refund of the impact fees to any party was a possibility, there is no factual evidence in the record or the briefs to support the theory that the developers retained these rights through a contract. Counsel for the developers conceded during oral argument that it would be highly improbable for such contracts to exist, and their existence would obviously be known to the developers as contractual parties. As this theory leads only to a mere possibility and not a reasonable probability that such a contract exists, this court will not consider it a sufficient allegation to establish standing. *See Brown*, 2010 UT 14, ¶ 19.

¶37 Nor can the developers establish standing under the compensation theory. As we noted in *Bradshaw v. Wilkinson Water Co.*, "[r]eal estate development is a speculative enterprise." 2004 UT 38, ¶ 17, 94 P.3d 242. The real estate market is subject to the fluctuations of the economy, and the profit margin will largely be determined on the market conditions at the time of sale. Whether the impact fees were recouped in the sale of the lots is immaterial to establishing standing. The impact fees, if constitutional at the time of exaction, are part of the price of doing business in real estate development, and developers assume the risk that they might not be

recouped when individual lots are sold. To suffer a legal injury, there must be a violation of a legal right, and the developers have no legal right to recoup impact fees from lot or home purchasers. Here, West Jordan lawfully exercised its police powers to impose an impact fee on the developers. "[I]f the owner [of a property] through a lawful exercise of [police] power suffers inconvenience, injury, or a loss, it is regarded as damnum absque injuria." *Colman v. Utah State Land Bd.*, 795 P.2d 622, 628 (Utah 1990) (citation omitted). The developers do not argue that there was a constitutional violation in the assessment of the impact fees, and without a violation of a legal right when the fees were collected, there is no compensable loss to the developers.

## 2. Traditional Standing Not Established

¶38 The developers have failed to establish standing under the traditional standing test. The only expectation the developers could reasonably have for paying the constitutionally levied impact fees was approval for their development, which they received. After the payment of the impact fees, the residents of West Jordan retain the interest in having those fees used as designed, not the developers. Any injury from misuse of impact fees would be to the residents, either from being underserviced or from increased taxes to cover costs of additional development that should be paid from the impact fees. We express no opinion here on the nature of any such injury or on what, if any, remedies for it might exist. But the relief requested by the developers—the refund of any unspent or misspent impact fees—would not redress the true parties in interest.

### B. Separation of Powers

¶39 Our standing requirement helps to ensure that the judiciary does not exceed the constitutional limits on judicial power. "[J]udicial power to determine the validity of executive or legislative action" can be invoked only when a "claimant [can] show that he has sustained or is immediately in danger of sustaining a direct injury as a result of that action." *Baird v. State*, 574 P.2d 713, 717 (Utah 1978).

> To grant standing to a litigant, who cannot distinguish himself from all citizens, would be a significant inroad on the representative form of government, and cast the courts in the role of supervising the coordinate branches of government. It would convert the judiciary into an open forum for the resolution of political and ideological disputes about the performance of government.

*Id.* It is the judiciary's role to interpret statutes and to ensure their constitutionality. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803); *Matheson v. Ferry*, 641 P.2d 674 (Utah 1982). It is not the judiciary's role to augment existing statutes to satisfy private parties in matters of public interest, nor to enforce statutes where no judicial remedy for private parties is anticipated or provided for in the statute. These roles are the primary domain of the legislative and executive branches.

¶40 As the developers noted in arguments before the district court, the issue at hand can be addressed in the legislature. "[T]he airing of generalized grievances and the vindication of public rights are properly addressed to the legislature, a forum where freewheeling debate on broad issues of public policy is in order." *Jenkins*, 675 P.2d at 1149–50. If the developers want the right to a refund of unspent impact fees, or if they want an enforcement provision, or if they do not like the ways that impact fees are calculated or may be expended, they can seek legislative modification of the statute. The appropriate remedy for the developers is not an action brought before the judiciary, but an appeal to the legislature. Moreover, execution and enforcement of the law is primarily under the purview of the executive branch. The Impact Fees Act allows developers to object to impact fees within certain parameters. *See* UTAH CODE §§ 11-36a-701 to -705. If no objection is made and adjudicated at the time the impact fees were assessed as provided by statute, the claim can no longer be brought by the developers.

## CONCLUSION

¶41 The developers have failed to state a takings claim for which relief can be granted. The developers lack standing to bring their claims in equity. That lack of standing denies the judiciary subject matter jurisdiction over the developers' claims in equity. We reverse the denial of the motion to dismiss on both the takings claims and the claims in equity and remand to the district court for dismissal of these claims.